**Z. W. Lepkowski, Appellant, v. B. Laukemper, Appellee.**

**Gen. No. 42,183.**

Opinion filed January 6, 1943.

SMIETANKA, CONLON & NOWAK, of Chicago, for appellant; GEORGE H. MORTON, of Chicago, of counsel.

JOHN TAYLOR BOOZ, of Chicago, for appellee.

MR. PRESIDING JUSTICE BURKE delivered the opinion of the court.

A complaint filed in the circuit court of Cook county on May 25, 1940 by Zigmund W. Lepkowski against Bernard Laukemper alleges that plaintiff was engaged for many years in the business of florist, horticulturist and landscape gardener on the northwest corner of LeMoyne Street and Oakley Boulevard, Chicago; that in carrying on his business he leased a tract of land from defendant and maintained thereon certain green and store houses, conservatories and gardens for the purpose of propagating, growing, housing and the sale of seeds, plants, bulbs, flowers and other verdure; that he accumulated on the premises numbers and quantities of such products ready for sale in the market; that while he was the legal owner and in rightful possession of said articles together with certain other fixtures and personalty located on said land, and in the act of removing the same from said tract on or about May 18, 1940, and while the defendant disclaimed any right of property in the personalty and fixtures, the defendant mounted an elevation upon the land or in close proximity thereof and harangued passers-by and thereby unlawfully assembled a mob of people, and with the evil and malicious intent to do harm and damage to the plaintiff and plaintiff's possessions aforesaid, in a loud and commanding voice incited the assemblage to destroy and carry away the property of

the plaintiff, and being so incited the mob did carry away, destroy or demolish the same or a greater portion thereof; that although plaintiff exercised every precaution that a reasonably prudent person should under the circumstances for protection of his property, due to the conduct and malicious and mischievous actions of the defendant, the plaintiff was overwhelmed and defeated in his purpose. Plaintiff asked judgment in the sum of $5,000. Defendant answered, denying that plaintiff leased a tract of land from him; asserted that he (defendant) never had title to the property and therefore could not lease the premises to the plaintiff; denied that plaintiff was the legal owner and in rightful possession of the articles, fixtures and personalty located on the land; denied that he (defendant) made any statement disclaiming any right or property in the personalty and fixtures; denied that he mounted an elevation upon the land or in close proximity, or that he assembled a mob or any number of people, or that he had any evil or malicious intent to do any harm or any damage to plaintiff or plaintiff's possessions; denied that in a loud and commanding voice he incited the assemblage, or any person or persons, to destroy or carry away the property of plaintiff; denied that any person or persons did carry away, destroy or demolish the property of plaintiff, or any part thereof. Further answering, defendant said that if any personalty or fixtures were removed, such removal was done by the bailiff of the municipal court of Chicago pursuant to a writ of restitution issued by the clerk of the municipal court and delivered to the bailiff of that court on or about May 15, 1940. Defendant denied that plaintiff exercised any precaution whatever in the protection of his said property and denied that he, defendant, was guilty of any conduct or of any malicious or mischievous actions which overwhelmed or defeated the plaintiff; and denied that plaintiff was injured or damaged in the manner or to the extent al-

leged, or that plaintiff, by reason of any action or conduct or intent of the defendant, sustained any damages. A trial before the court and a jury resulted in a verdict finding the defendant guilty, and assessing plaintiff's damages in the sum of $4,500. The jury also returned a special finding, reading: ''We the jury find from the evidence that the defendant was guilty of wilful and wanton conduct in committing the acts which caused the damage as alleged and that malice is the gist of the action.'' Motions by the defendant for a directed verdict and for judgment notwithstanding the verdict, were overruled. Defendant's written motion for a new trial was sustained. We allowed plaintiff's petition for leave to appeal from this order.

The real estate involved in this law suit is located at the northwest corner of LeMoyne Street and Oakley Boulevard, also known as 1500-08 N. Oakley Boulevard, Chicago, and is owned by the Catholic Bishop of Chicago, a corporation sole. The defendant, Bernard Laukemper, has been the pastor of St. Aloysius Catholic Church since January 1932. His predecessor was Father Thiele. Defendant resides at 2342 LeMoyne Street. St. Aloysius Church is located at the corner of LeMoyne Street and Claremont Avenue. Claremont Avenue and Oakley Boulevard are north and south streets, Claremont Avenue being one block west of Oakley Boulevard. The record shows that in the management and rental of the real estate the defendant was acting as the agent of the Catholic Bishop of Chicago, a corporation sole. Plaintiff first became a tenant in 1928, while Father Thiele was pastor. At that time there was a small store building on the corner and greenhouses in immediate proximity. There was evidence that in 1932 the plaintiff or his wife, or both, expended $1,200 in remodeling and improving the store, and that between the years 1930 and 1932 plaintiff or his wife, or both, expended $3,000 remodeling existing greenhouses and building a new one. The

greenhouses rested on heavy planking and were not affixed to the ground. After the defendant became pastor of the church, plaintiff paid to him as rent $105 every three months. In the spring of 1940 the premises were occupied by three greenhouses, a store and a combination garage-boiler room. In October 1939 Father Laukemper filed an action in forcible detainer and for rent against plaintiff, asking judgment for possession and for the accrued rent. On October 25, 1939 plaintiff and defendant executed a sealed instrument in which Father Laukemper is described as the "agent of the Catholic Bishop of Chicago so far as management, rental, termination of rental, etc. of the above described real estate." This agreement recited the pendency of the action in the municipal court, and stated:

"That the tenancy of Z. W. Lepkowski of the premises above described shall terminate on March 31, 1940, and that the rental from this date to March 31, 1940 shall be calculated on the basis of $105.00 a quarter, payable in advance, which B. Laukemper agrees to accept and Z. W. Lepkowski undertakes to pay. That a judgment for possession of said premises shall be entered by agreement in the pending Municipal Court action with execution on said judgment to be stayed until March 31, 1940, provided that the rent when due is paid promptly. That Z. W. Lepkowski shall remove from the premises on or before March 31, 1940, all of the buildings, sheds, chimneys, equipment, growing stock and other things thereon situated, and shall on said date turn over to B. Laukemper possession of said tract of land free and clear of any buildings, sheds, chimneys, equipment, growing stock and other things thereon situated, so that B. Laukemper shall not be put to any expense in removing the same after the termination of the tenancy herein."

Judgment for possession was entered in the municipal court and the writ of restitution was stayed until

March 31, 1940. Plaintiff did not vacate the premises on March 31, 1940. There was evidence that with the consent of the defendant, plaintiff was permitted to remain on the premises. The parties had more than one conversation on a proposition submitted by defendant to plaintiff relative to the leasing by plaintiff of another tract of land owned or controlled by the defendant and located in the same neighborhood. On May 15, 1940 the defendant, who was the plaintiff in the forcible detainer case in the municipal court, directed that the writ of restitution be served. Anthony Contursi, a deputy bailiff of the municipal court went to the premises at 9:30 a. m. on Saturday, May 18, 1940. He showed the writ of restitution to Lepkowski and his wife and informed them of the purpose of his visit. He then proceeded to execute the writ. Defendant maintains that the testimony of plaintiff does not show that plaintiff was the owner of or entitled to possession of the buildings, sheds and other equipment. In view of the agreement of October 25, 1939, and the fact that the wife of plaintiff who testified for him is not claiming ownership, we are of the opinion that there was competent evidence to warrant the jury in finding that on May 18, 1940 plaintiff was the owner of and entitled to the possession of the buildings, sheds, equipment, flowers, plants, bulbs, etc.

Prior to May 18, 1940 plaintiff had commenced to remove the greenhouses, plants, etc., from the premises. At the time the deputy bailiff arrived there was still standing on the land one-half of the greenhouse that had been built in 1930, the dimensions of which were approximately 34 by 45 feet. This greenhouse was set on heavy blocks with boards on the side, and the remainder was glassed in. Plaintiff testified that after the deputy bailiff arrived, a crowd of from 200 to 400 people gathered; that defendant was standing in the alley smoking a cigar; that defendant talked to the people but that witness did not hear what he said; that the people picked up "everything from the yard

by the greenhouse and flowers and whatever they had they took it right away, all the wood, rafters and so on''; that he called the police, who came and talked to defendant; that the police then told the witness that everything belonged to him (meaning defendant); that the police then left; that then two employees of defendant came and with two by fours began to demolish the greenhouse. William J. Wall, called by plaintiff, testified as to the damage and the value of the property which plaintiff claims was removed. Walter J. Rieger, called by plaintiff, testified that he was a real estate broker; that he was near the premises between 10:30 and 11 o'clock on May 18, 1940; that he saw from 100 to 150 people there, ''possibly more''; that there was ''some commotion''; that he saw boys coming out and taking flowers from the sidewalk ''next to his hothouse there''; that he remained about an hour; that he saw boys, men and women taking flowers from the sidewalk and carrying them away; that there were men knocking the walls from the side of the hothouse; that he did not see Father Laukemper there, and that the greenhouse was in good condition the last time he saw it prior to May 18, 1940. Alex Byear, called by plaintiff, testified that he visited the premises about noon on May 18, 1940; that there were about 300 men, women and children; that they were wrecking the building; that he saw a priest but could not say he was the defendant; that the priest was talking to the people that were wrecking the building, after which the people stopped for about ten or fifteen minutes; that they then ''went at it again''; that the people ''went through it just like a cyclone''; and that in ten minutes there was not a glass in the building. The witness was asked as to how many people he talked to. Evidently, the interrogator meant how many people the priest talked to. The answer was that ''he must have had a dozen people there. I didn't pay much attention. I was working, but there was a bunch

around and anyway when he walked away later they went to it. There was not a glass in the building in ten minutes.'' He further testified that he did not see the priest after the people came back. Henry Radcliffe, called by the plaintiff, testified that he arrived at the scene at 11:45 a. m.; that they were sent to take out the pipes and a boiler; that 300 or more people were around there; that they were taking flowers and breaking windows; that some were pulling the boards away and others were carrying the wood away; that ''as we worked there we were in very much danger; that he saw the defendant, who was in the back end, in the alley near the boiler room; that the defendant was not there when witness first arrived; that he [defendant] came in later around when the kids was so bad until he called some of the kids away and he spoke to the kids but mostly the ones that was breaking the glass and there was another young fellow. He was talking to them also, so he leave, about fifteen, twenty minutes, maybe a little longer, I would not be exactly sure, and they started all over again but the people who was taking the flowers they didn't stop.'' In response to a question as to whether the witness knew what defendant said to the people, he answered, ''No, I don't know what he said to the kids there.'' Philomena Lepkowski, wife of plaintiff, testified that she worked in the florist shop; that she had been to the market and returned about 10 a. m.; that ''they started to wreck already, the children and everything.'' She further testified that there were from 100 to 150 people there, and that she saw the defendant who said to the people: ''Grab it, take it, everything, everything belong to me.'' Witness further testified that defendant was smoking a cigar and laughing and said: ''I did not have so much fun like I have today.'' Abraham Byear, called by plaintiff, testified that he purchased from plaintiff the boiler, pipes and fittings that were on the premises, and that he and his men went there to

remove these chattels. Asked as to whether he observed anything when he arrived, he answered: "Well, to tell you the truth you were in danger over there." He testified that he saw from 150 to 200 "kids" and a few grown-ups; that the children with long poles were knocking the glass out of the greenhouse; that witness's men were on the inside and did not want to work for fear of being cut; that he saw defendant; that he did not observe him talking to anyone; that he did not hear him say anything; that he observed him talking to somebody but did not listen to what was said; that defendant was talking to four or five people; and that defendant did not break any glass. In answer to the question: "What did you see the defendant do?", witness answered: "Just going through the alley, and never said anything to those kids or the people over there stealing and taking stuff, never said anything but just smoked a good cigar, going through the alley." Bronis Kolikowski, called by plaintiff, testified that she was at Oakley and LeMoyne at 9:30 a. m.; that about 10 o'clock she observed the defendant standing in the alley; that he was smoking a cigar and laughing; that she saw about 80 children; that the children yelled, "All ready," and they started to break the glass; that defendant was there in the afternoon; that he talked to the people; that after he talked to the children, "they take everything and broke it." Anthony Contursi, the deputy bailiff, called by defendant, testified that he arrived about 9 or 9:30 a. m.; that he proceeded to execute the writ of restitution; that he and his men remained there until about 2:30 p. m.; that they proceeded to remove the plants and flowers; that he saw the defendant there; that the defendant did not come near the flower shop; that the witness and his men put the plants and flowers on the sidewalk, near the street. In answer to the question: "Did you protect this man's property?", this witness answered: "I couldn't protect the property. They were taking care of it. He was there to take care of it."

Defendant, called in his own behalf, testified that on May 18, 1940 he saw the deputy bailiff and his assistants; that he tried his best to keep the youngsters from getting hurt; that his presence on the scene was to avoid danger there; and that he told the people they could have the wood for firewood. He denied that he assembled a mob in the neighborhood of the florist shop, or that he encouraged anyone to take any property that belonged to the plaintiff. He further testified that he inquired of a number of people he saw with plants as to how they acquired them; and that he did not have anything to do with the plants that were on the sidewalk or parkway. On cross-examination, he testified that he tried to hold the children back by talking to them; that two athletic coaches were there who were not employed by defendant; that these men also helped to stop the children. Witness also testified that "as fast as the bailiff was through removing the things, we were taking the place down, because it was our property"; that he was on the grounds off and on during the day and that his main concern was to see that no one was injured. John A. Shell, called by defendant, testified that he was the janitor for St. Aloysius Parish; that he saw·Father Laukemper about fifteen minutes while he (witness) was near the premises; that he did not hear Father Laukemper urge anyone to take or remove any property; that on the contrary Father Laukemper told the children not to throw any stones, to be careful not to hurt anyone and to keep away from the buildings. Witness further testified that he did not do anything until "they had removed all the pipe from the greenhouse"; that he spoke to Father Laukemper about the danger of the glass that was intact on the Oakley Avenue greenhouse; that he advised Father Laukemper to have the glass removed so that the children would not get hurt; that the witness then wrecked the glass. John Slecter, called by plaintiff in rebuttal, testified that he was a police officer for the City of

Chicago; that on May 18, 1940 he answered a call to Oakley Boulevard and LeMoyne Street; that there was quite a crowd of children engaged in carrying out lumber and debris; that the children were engaged in carrying off "material and wooden stuff out in back of the building, and there were some parts of it that were dangerous and we wanted them to stay away from that." Witness further testified that he believed "we talked to the priest, to try to get him to get the children away from there"; and that the children then stopped.

The trial judge announced that the reason he was granting a new trial was because of errors committed in instructing the jury, the submission of a special finding in the manner in which it was submitted, and because of the lack of more positive and affirmative evidence as to the acts committed. A court of review will not interfere with an order granting a new trial based on disputes as to the facts, unless the record shows a clear abuse of discretion. (*Parke v. Lopez,* 306 Ill. App. 486; *Ledferd v. Reardon,* 303 Ill. App. 300; *Couch v. Southern Ry. Co.,* 294 Ill. App. 490.) However, the correctness of a ruling on a question of law will be determined on appeal, independently of the judgment of the trial court. (5 C. J. S., sec. 1620; *Randall v. Randall,* 281 Ill. App. 169.)

It is evident that the trial court judge felt that the evidence did not support the verdict, because he suggested that the plaintiff "get some more positive and affirmative evidence as to the acts committed." Plaintiff's case, as disclosed by his complaint, is that the defendant mounted an elevation and harangued passers-by and thereby unlawfully assembled a mob, and that in so doing, defendant was actuated by the evil and malicious intent to do harm and damage to the plaintiff and to his possessions, and that defendant, in a loud and commanding voice incited the assemblage to destroy and carry away the property of the plain-

tiff, and that being so incited the mob did carry away and destroy a great portion of the property of plaintiff. It is evidence that the jurors believed this charge, for they found the defendant guilty, and also found him guilty of wilful and wanton conduct and that malice was the gist of the action. It is clear that the verdict and finding are contrary to the manifest weight of the evidence. There was competent evidence that the defendant talked to the children in an effort to have them desist from a continuance of the damage they were doing, and some of plaintiff's witnesses lend support to this evidence. The children heeded the request for a period of ten or fifteen minutes. The defendant left the scene, after which the children resumed breaking the glass and removing plants, flowers and other articles. Defendant testified that he was afraid the children would be injured. Two of the workmen who were engaged in removing certain pipes sold to their employer by plaintiff, testified that they were in danger of being cut by the glass. We are satisfied that the court exercised a wise discretion in granting a new trial.

We are of the opinion that it was error to instruct the jury that they could find that malice was the gist of the action. The evidence was not sufficient to show that defendant was actuated by malice, nor was malice the gist of the action. Because of these views, the order of the circuit court of Cook county is affirmed.

*Order affirmed.*

HEBEL and KILEY, JJ., concur.