ST. PAUL FEDERAL SAVINGS AND LOAN ASSOCIATION OF CHI-
CAGO, Plaintiff-Appellee, v. MARIE E. AVANT *et al.*, Defendants (Tollway
Arlington National Bank, Defendant-Appellant).

First District (1st Division)   No. 84—0941

Opinion filed July 29, 1985.

Berger, Newmark & Fanchel, P.C., of Chicago (Harry D. Lavery and George A. Zeics, of counsel), for appellant.

Rudnick & Wolfe, of Chicago (Don E. Glickman and Steven S. Levenson, of counsel), for appellee.

JUSTICE O'CONNOR delivered the opinion of the court:

This appeal involves an action by plaintiff, St. Paul Federal Savings and Loan Association of Chicago, based upon theories of unjust enrichment and constructive trust for the recovery of funds paid to defendant, Tollway Arlington National Bank (Tollway), in return for Tollway's release of a purported mortgage on certain residential real estate. After Tollway had accepted payment from plaintiff, it was discovered that the mortgage released was of no value, as it had been based upon a forgery perpetrated by one of Tollway's commercial customers. The trial court granted plaintiff's motion for summary judgment for the return of the funds paid to Tollway, and Tollway appeals. In addition, Tollway appeals the trial court's denial of its claim for reasonable expenses and attorney fees pursuant to section 2—611 of the Code of Civil Procedure. We affirm.

The lengthy record in this case reveals an elaborate real estate fraud scheme in which both plaintiff and defendant were apparently victimized. The basic facts can best be drawn from a review of the pleadings themselves.

St. Paul instituted the original action in September 1981, to foreclose a mortgage on certain real estate located in Glenview (subject property) made by Marie E. Avant and secured by Avant's promissory note to plaintiff in the amount of $62,300. Also listed as defendants were a "Mr. and Mrs. Kolock [sic]" and "unknown owners." An answer was subsequently filed by Luana and Richard Koloch, stating that Avant at no time had any legal or equitable interest in the subject property, that they were the sole legal and equitable owners thereof and that they had not conveyed, or authorized anyone else to convey, any interest in the subject premises. The Kolochs also filed a counterclaim to quiet title, naming Robert Anderson, Robert Thomas & Associates, Inc., First Arlington National Bank, as trustee under trust No. A1291, Tollway Arlington National Bank, Avant and St. Paul as counterdefendants. In its answer, St. Paul again averred its interest in the subject property as set forth in its complaint.

The record shows that Luana Koloch was deposed in July of 1982, and additional counsel appeared for St. Paul in September 1982. St. Paul then amended its complaint adding counts II and III against Robert Anderson and Walter Chiczewski, Robert Thomas & Associates and Suburban Realty and Investments, Thomas Schwendau, the former husband of Marie Avant d/b/a T&J Management, Avant and Tollway. Counts II and III charged these defendants with conspiring to defraud St. Paul of $62,300 through various acts, including: Anderson forging the Kolochs' names to an October 3, 1982, deed in trust which conveyed the subject property to trust A1291 and designating himself as beneficiary of said trust; Chiczewski notarizing the forged signatures of the Kolochs on the deed in trust; Anderson obtaining a $50,000 loan on or about December 4, 1980, from Tollway secured by a mortgage on the subject property with Tollway's actual or constructive knowledge that Anderson lacked authority to direct the execution of such a mortgage; Anderson then forging the Kolochs' names to a real estate contract prepared by Chiczewski and purporting to sell the subject property to Avant, Anderson and Chiczewski, then mailing to St. Paul a mortgage application signed by Avant to finance the purchase of the subject property, which application contained false information intended to deceive St. Paul; Schwendau falsely verifying Avant's employment and yearly salary with T&J Management to St. Paul; Avant's executing a mortgage on the subject property to secure her indebtedness to St. Paul. It was also alleged that Avant had never intended to purchase the subject property, or paid any earnest money to Suburban Realty and Investment as indicated in the real estate contract. On the basis of the false information and documents submitted to it, St. Paul loaned Avant $62,300 to purchase the subject property from trust A1291, disbursing $51,350.66 of the net proceeds of the mortgage loan to Tollway to pay off Anderson's purported mortgage, and the balance to Anderson. St. Paul also alleged that the foregoing sums were wrongfully obtained by Anderson and Tollway in that they knew or should have known that Tollway did not have a valid mortgage on the subject premises.

Tollway's answer admitted the mortgage loan to Anderson and its receipt of $51,350.66 from St. Paul in the name of Anderson to pay off said loan. It denied knowledge of any wrongdoing on the part of Anderson and the other codefendants, and denied knowledge of or participation in any wrongful conduct or conspiracy.

Extensive discovery ensued and subsequently, on September 9, 1983, St. Paul was given leave of court to withdraw its charges

made in counts II and III against the various defendants and to file its counts IV and V in unjust enrichment and for constructive trust against Tollway alone. At the same time, Tollway's motion for attorney fees and expenses incurred as a result of the withdrawn allegations was denied "without factual hearing."

In counts IV and V, St. Paul again alleged Tollway's December 1980 loan to Anderson, which was secured by a mortgage on the subject property and other property, as well as a series of loans by Tollway to Anderson between July 1979 and July 1981, representing a continual course of business with Anderson during that time. St. Paul further alleged that on January 30, 1981, it paid Tollway $51,350.66 to release its mortgage on the subject property under the mistaken belief that Tollway's mortgage was valid, that Tollway was in a better position than St. Paul to discover the invalidity of its mortgage because of its continuing course of business with Anderson, and that Tollway in fact released nothing of value, thereby becoming unjustly enriched at St. Paul's expense.

In its answer to counts IV and V, Tollway denied knowledge of the forgeries by Anderson, and denied that it was in a better position than St. Paul to discover the invalidity of its mortgage. Tollway also stated that the only security other than the mortgage on the subject property and the assignment of the beneficial interest in trust A1291 for the $50,000 loan to Anderson was collateral which had been previously pledged to secure an earlier loan by Tollway to Anderson and which subsequently had to be liquidated to reduce Anderson's indebtedness arising out of that loan. Tollway admitted that it had made six loans and various renewals to Anderson between July 1979 and February 1981, and that an Anderson entity maintained a checking account at Tollway during that time; however, it denied a "continual course of business" with Anderson.

By way of affirmative defense, Tollway stated that St. Paul had failed to exercise ordinary care in verifying the false statements made by Avant in her loan application before disbursing its loan proceeds and that St. Paul's failure to inquire into the Koloch's possession of the subject premises or to verify any impending sale with those persons then in possession was the direct and proximate cause of the loss sustained by St. Paul. Tollway also alleged that Luana Koloch had notified St. Paul shortly after the Avant loan closing that Avant did not reside at the subject property, but despite these communications, St. Paul made no claim on Tollway for the $51,350.66, continuing to request Tollway's release of the beneficial interest in trust A1291. Tollway contended that St. Paul's acceptance of the re-

leases with knowledge of the aforesaid facts constituted a waiver by St. Paul and estopped plaintiff from making any claims against Tollway for monies disbursed on the Avant loan. In addition, it alleged that by abandoning its efforts to collect from those defendants previously named in counts II and III, St. Paul had waived and was estopped from any recovery against Tollway. It further alleged that, pursuant to the trustee's direction that the sale proceeds be paid to Anderson, the $51,350.66 paid to Tollway was received by Tollway for the benefit of Anderson. Finally, Tollway denied that it was unjustly enriched at the expense of St. Paul, stating that it gave good and valuable consideration to Anderson when it loaned that amount to him and that it applied the $51,350.66 it received for, and on behalf of, Anderson in payment and satisfaction of Anderson's indebtedness.

St. Paul subsequently filed its motion for summary judgment on counts IV and V of its complaint along with extensive exhibits. In it, St. Paul alleged Anderson's forgery on the deed in trust to First Arlington National Bank by which he designated himself beneficiary, and Tollway's loan of $50,000 to Anderson secured by a mortgage and by Anderson's purported beneficial interest. St. Paul further alleged that Avant applied to it for a loan in the amount of $62,300 purportedly to finance her purchase of the subject property, and that as security for its loan, St. Paul attempted to obtain a first lien on the property. In this process, St. Paul received a pay-off letter signed by Robert Lawler, Tollway's then president. The letter, which is attached to plaintiff's motion as exhibit A, stated that on January 30, 1981, Tollway would accept a pay-off amount of $51,350.66 in the name of Robert Anderson, in exchange for which it would release its mortgage on the subject property. St. Paul alleged payment and acceptance by Tollway of the specified sum on January 30, 1981. Subsequently, but not until six months later on July 21, 1981, Tollway released its purported mortgage on the subject property.

St. Paul further alleged that its claim was supported by the nature of Tollway's ongoing relationship with Anderson, as evidenced by a series of loans and renewals by Tollway to both Anderson personally and to Robert Thomas & Associates, Inc., Anderson's business entity, which were secured either by mortgage or trust deed, or through assignment of beneficial interest or both, on various properties purportedly owned by Anderson. Certain of these loans or renewals were made as late as February and July of 1981, after the $51,350.66 payment by St. Paul to Tollway, and others were consolidated into a new note for $95,000 in July 1981, after Tollway's re-

lease of its purported mortgage. St. Paul's motion also contained deposition excerpts from Robert Lawler stating that Tollway understood from the nature of Anderson's business that the property used as collateral might be occupied by strangers to the notes between Tollway and Anderson. Lawler also stated that Anderson's company, Robert A. Thomas & Associates, Inc., maintained a checking account at Tollway and it was understood that Tollway could use the cash in the bank accounts if necessary to offset Anderson's debts there. In addition, Tollway received personal financial statements from Anderson in June 1979 and March 1981, and at least one personal guarantee on a note.

Tollway's officers also testified, by way of deposition, that its relationship with Anderson was not typical of its lending transactions with other customers and that Anderson was its only second mortgage broker customer. Tollway was aware that Anderson would make himself a beneficial owner of the property owned by his customers, and that notwithstanding Anderson's claim of ownership of the properties used as collateral, there were other people living on the various properties and claiming ownership interests. Tollway's officers also met with Anderson on numerous occasions. Lawler stated that his immediate reaction to Anderson was that "he [Anderson] was too fast and too glib *** he was a machine gun talker and when he got through you didn't know what he said" and for this reason, Lawler stated that he "went very slowly with him." Lawler admitted, however, that Tollway did nothing out of the ordinary to verify Anderson's honesty or credibility. Finally, Anderson's daughter had been employed by Tollway at the recommendation of Anderson, and upon occasion carried documents between Tollway and Anderson.

Based on the foregoing, St. Paul alleged that Tollway was in a much better position than itself to discover the dishonest nature of Anderson's business and to prevent the series of transactions leading to St. Paul's ultimate loss, and, because of its extensive relationship with Anderson, that Tollway was also in a better position to recover from him should any loss from his loan arise. Conversely, St. Paul alleged that its payment to Tollway was made under the mistaken belief that Tollway would release a valid mortgage. Thus, the sole consideration for St. Paul's payment—Tollway's release—failed as a result of which St. Paul paid off Tollway's loan to Anderson with interest and received nothing in return.

St. Paul's motion also included the deposition testimony of its president, Joseph Scully, refuting Tollway's allegations that St. Paul was negligent in its dealings with Avant, and stating that St. Paul

performed all of the customary and usual credit checks on Avant and received verification of her employment and of deposit. Its assistant vice-president and branch manager testified that he had approved Avant's credit and at no time did he recall any dealings with either Anderson or Schwendau. It was also established by her own deposition testimony that Luana Koloch had cooperated with St. Paul's appraiser during his examination of the subject property and that she failed to indicate to him at that time that she was not selling the property. Koloch also admitted that, pursuant to Anderson's direction, she sent the majority of correspondence received from St. Paul unopened directly to Anderson, and that when St. Paul informed her of its belief that the Kolochs had sold the property, she did not attempt to correct it.

Finally, St. Paul asserted that Tollway's waiver and estoppel arguments must fail where St. Paul had already made its payment to Tollway at the time of the alleged communications from Mrs. Koloch regarding possession of the subject property and where Tollway had neither alleged nor shown any instance of detrimental reliance on its part as a result of either of those communications or of St. Paul's failure to pursue a cause of action against the defendants named earlier in counts II and III of its complaint.

In response to St. Paul's motion, Tollway reiterated its earlier claim that its receipt of money from St. Paul did not result in Tollway's unjust enrichment in that it used such money to satisfy a "bona fide indebtedness" from Anderson, and that it was entitled to receive, and did receive such money without knowledge of any claimed mistake and without any fraud or impropriety on its part. Tollway further argued that once St. Paul determined to make its mortgage loan to Avant in connection with her purchase of the subject property, the money so disbursed became Avant's money, which was subsequently paid on her behalf to Anderson and used to satisfy Anderson's debt to Tollway. Thus the validity of St. Paul's mortgage depended not on the validity of Tollway's mortgage but on the validity of the fee title of Avant's grantor, that being trust A1291 purportedly holding the subject property. Tollway further argued that nothing in the record supported St. Paul's claim that Tollway knew or should have known that the deed in trust A1291, or Tollway's mortgage secured by that purported deed, was invalid.

On February 7, 1984, the trial court granted St. Paul's motion for summary judgment and entered judgment against Tollway in the amount of $51,350.66. It subsequently denied Tollway's motion to reconsider and vacate St. Paul's judgment and to enter summary judg-

ment in its favor.

■ Tollway argues that it has not been unjustly enriched because it used the funds paid it by St. Paul to satisfy a *bona fide* indebtedness due to it. Tollway cites the Restatement of Restitution, which in defining unjust enrichment notes that "where a person has received a benefit from another, he is liable to pay therefor only if the circumstances of its receipt on retention are such that, as between the two persons, it is unjust for him to retain it." (Restatement of the Law of Restitution sec. 1, comment c (1937).) Tollway further asserts that any loss sustained by St. Paul did not result from a mistake of fact regarding Tollway's mortgage, and that the principle of unjust enrichment does not require that it absorb the loss sustained by St. Paul as a result of fraud perpetrated upon St. Paul by Avant in her separate and distinct loan transaction. Finally, Tollway argues that even if it had been unjustly enriched at St. Paul's expense, it would be inequitable to require Tollway to pay over the monies it received because it suffered a prejudicial change of position by cancelling the note from Anderson and discharging liability thereon, and because St. Paul's loss was caused by its own negligence in its loan transaction with Avant.

Tollway cites several cases in which courts have rejected the contentions of third parties that because of failure of consideration, mistake of fact or unjust enrichment, monies received by creditors should be returned. (*Gaffner v. American Finance Co.* (1923), 120 Wash. 76, 206 P. 916; *Hilliard v. Bank of America National Trust & Savings Association* (1951), 102 Cal. App. 2d 730, 228 P.2d 327; *Spaulding v. Peoples State Bank* (1975), 25 Ill. App. 3d 118, 323 N.E.2d 143; *Strubbe v. Sonnenschein* (2d Cir. 1962), 299 F.2d 185; *Union Central Life Insurance Co. v. Glasscock* (1937), 270 Ky. 750, 110 S.W.2d 681; *Associates Discount Corp. v. Clements* (Okla. 1958), 321 P.2d 673.) In each of these situations, innocent parties extended credit or parted with funds in order to discharge purported liens on stolen property or based on false documents. In subsequent actions by the third parties to recover the funds paid under mistake, those courts refused to apply the general rule of restitution, reasoning either than the liens, although invalid and worthless, were merely "accessory to the principle debt" which was itself valid and enforceable (*Hilliard v. Bank of America National Trust & Savings Association* (1951), 102 Cal. App. 2d 730, 733, 228 P.2d 327, 329; *Gaffner v. American Finance Co.* (1923), 120 Wash. 76, 80, 206 P. 916, 918), or that where one of two innocent parties would suffer a loss because of a mutual mistake, in the absence of a showing of bad faith, misrepre-

sentation or inducement by the third party, there was no compelling reason for preferring one innocent victim over the other. *Spaulding v. Peoples State Bank* (1975), 25 Ill. App. 3d 118; *Strubbe v. Sonnenschein* (2d Cir. 1962), 299 F.2d 185; *Union Central Life Insurance Co. v. Glasscock* (1937), 270 Ky. 750; *Associates Discount Corp. v. Clements* (Okla. 1958), 321 P.2d 673.

Tollway also cites *Walker v. Conant* (1888), 69 Mich. 321, 37 N.W. 292, and *California Pacific Title & Trust Co. v. Bank of America National Trust & Savings Association* (1936), 12 Cal. App. 2d 437, 55 P.2d 533, cases involving a forged mortgage and a loan secured by a forged trust deed, in which recovery was also denied the innocent creditors based on the rationale that payment by the second mortgagees of the invalid first loans were merely incidents of the real estate transactions and not the cause of the second mortgagees' losses, which were occasioned solely by fraud in the second mortgage transactions.

Finally, Tollway cites *Ex parte Richard* (1913), 180 Ala. 580, 61 So. 819, in which the court refused to return monies paid to a prior mortgage by a subsequent mortgagee in order to obtain a first lien on the subject property, reasoning that the monies in question were not in legal effect the subsequent mortgagee's monies but rather were those of the swindler who had borrowed from the parties.

Contrary to those cases cited by Tollway is *Strauss v. Hensey* (1896), 9 App. D.C. 541, which involved a factual situation virtually identical to the case at bar. There, defendant loaned money to a swindler in return for notes and trust deeds which were later learned to have been forged. Plaintiff then loaned money to the same swindler, and paid off defendant's worthless trust deeds in order to obtain a superior lien on the property. The court held that plaintiff could recover the monies paid to defendant, reasoning that the defendant was deceived and cheated out of his money when he took the worthless notes, and should not be indemnified in the result of a like fraudulent transaction practiced by the same impostor upon the plaintiff.

Tollway attempts to distinguish *Strauss* and the other cases cited by St. Paul on the basis that the notes, as well as the mortgages involved, were forged and that therefore the defendants in those cases were not owed a "*bona fide* indebtedness." We find this distinction to be artificial and without meaning. The court in *Strauss* focused not on the validity of the indebtedness between the swindler and defendant, but rather, based its holding on the failure of consideration to plaintiff for paying off that indebtedness.

Similarly, in *Grand Lodge, A.O.U.W. v. Towne* (1917), 136 Minn. 72, 161 N.W.403, a swindler procured loans from both defendant and then plaintiff, secured by forged notes and mortgages. In holding that plaintiff was entitled to restitution, the court stated:

> "It is entirely immaterial that defendant honestly believed he was entitled to the money, or that he was guilty of no fraud, or duress in obtaining possession of it. ***. The test is whether defendant has a right to retain the money, not whether he acquired possession honestly or in good faith. If the money belongs to plaintiff and defendant can show no legal or equitable right to retain it, he ought in equity and good conscience to pay it over." (136 Minn. 72, 77-78, 161 N.W. 403, 405.)

In so holding, the court disapproved of *Walker v. Conant* (1888), 69 Mich. 321, 37 N.W. 292, and *Ex parte Richard* (1913), 180 Ala. 580, 61 So. 819, both cases relied upon by Tollway. The court in *Grand Lodge* further rejected the same argument which Tollway now advances, that as a result of its acceptance of St. Paul's payment, it prejudicially changed its position when it cancelled its note, in that it could no longer collect from the swindler. The court in *Grand Lodge* noted that while defendant would clearly not be held liable had he irrevocably altered his position in reliance on the payment, the change of position must have been caused by the payment and must have been a material and irrevocable change. The court found that merely by receiving payment of his mortgage and giving up evidence of the supposed debt, the defendant had lost nothing of value. Finding that defendant's claim was too uncertain and speculative, the court concluded the only reasonable inference to be that, had plaintiff not paid defendant, defendant would still be the holder of a forged note and mortgage, but nothing else in the way of satisfaction for the money procured of him through fraud. *Grand Lodge, A.O.U.W. v. Towne* (1917), 161 N.W. 403, 407; see also *Walker v. Conant* (1888), 69 Mich. 321, 330-33, 37 N.W. 292, 296 (Sherwood, C.J., dissenting); *National Shawmut Bank v. Fidelity Mutual Life Insurance Co.* (1945), 318 Mass. 142, 150, 61 N.E.2d 18, 22; *Firestone Tire & Rubber Co. v. Central National Bank* (1952), 66 Ohio Abs. 45, 115 N.E.2d 476, 481; and *Ritter v. Manhattan A.F. Corp.* (1938), 5 N.Y.S.2d 773.

We believe the better rule to be that enunciated by the court in *Grand Lodge,* and, accordingly, we hold that because Tollway has failed to demonstrate any legal or equitable right to retain those monies paid to it by St. Paul under the mistaken belief that Tollway would in return release a valid lien on the subject property, Tollway ought

not in equity and good conscience retain those monies. (*Grand Lodge, A.O.U.W. v. Towne* (1917), 136 Minn. 72, 161 N.W. 403; see also *M.J. McCarthy Motor Sales Co. v. Van C. Argiris & Co.* (1979), 78 Ill. App. 3d 725, 396 N.E.2d 1253.) Illinois courts have recognized this rule in a variety of commercial cases and have consistently held that the fact that the person to whom the money was paid under mistake of fact was not guilty of deceit or unfairness, and acted in good faith, does not preclude recovery, nor does the negligence of the payor preclude recovery. *Bank of Naperville v. Catalano* (1980), 86 Ill. App. 3d 1005, 408 N.E.2d 441; *Board of Education v. Holt* (1976), 41 Ill. App. 3d 625, 354 N.E.2d 534.

■ Tollway next argues that St. Paul's allegations in counts II and III were untrue and made without reasonable cause, and that the trial court's denial of its motion for attorney fees "without factual hearing" was an abuse of discretion and constituted reversible error.

Section 2—611 of the Illinois Code of Civil Procedure provides as follows:

> "Allegations and denials, made without reasonable cause and found to be untrue, shall subject the party pleading them to the payment of reasonable expenses, actually incurred by the other party by reason of the untrue pleading, together with a reasonable attorney's fee, to be summarily taxed by the court upon motion made within thirty days of the judgment or dismissal." (Ill. Rev. Stat. 1983, ch. 110, par. 2—611.)

Because this section is penal in nature, it can be invoked only in cases falling strictly within its terms, and each of its two requirements must be proved. (*Grover v. Commonwealth Plaza Condominium Association* (1979), 76 Ill. App. 3d 500, 394 N.E.2d 1273.) Thus, it is incumbent upon the moving party to demonstrate that his opponent has abused its right to free access to the courts by pleading untrue statements of fact which he knew or reasonably should have known were untrue. (*Dayan v. McDonald's Corp.* (1984), 126 Ill. App. 3d 11, 16, 466 N.E.2d 945; *Third Establishment, Inc. v. 1931 North Park Apartments* (1981), 93 Ill. App. 3d 234, 417 N.E.2d 167.) The necessity of a hearing to determine whether the assertions are untrue or made without reasonable cause depends upon the circumstances presented in each case (*Grover v. Commonwealth Plaza Condominium Association* (1979), 76 Ill. App. 3d 500), and if the requirements can be proved or rebutted from pleadings, trial evidence, or other matter appearing in the record, a hearing on the merits is not needed and should not be required. *Launius v. Najman* (1984), 129 Ill. App. 3d 498, 505, 472 N.E.2d 170; *Brokaw Hospital v. Circuit Court* (1972),

52 Ill. 2d 182, 287 N.E.2d 472; *Dayan v. McDonald's Corp.* (1984), 126 Ill. App. 3d 11.

We are also mindful of the fact that attorneys are not required to make complete investigations of all facts before filing suit, and that, in deciding to file suit, they may exercise broad discretion based on an honest judgment from the facts presented to them. *Demos v. Ericson* (1982), 104 Ill. App. 3d 403, 405, 432 N.E.2d 1035; *Fewer v. Grant* (1982), 111 Ill. App. 3d 747, 444 N.E.2d 628.

The allegations complained of here charged Tollway with conspiring, along with the various other defendants, to defraud St. Paul. At the time these allegations were made, St. Paul's counsel was aware that the Kolochs' property had been put into trust at First Arlington National Bank by a trust deed prepared by Anderson's daughter, and by which Anderson had designated himself beneficiary; that Anderson had obtained a short-term loan from Tollway using the subject property as collateral, and that approximately one month later, St. Paul had paid Tollway $51,350.66 to release its claimed mortgage. St. Paul's counsel was also aware of two similar situations involving short-term loans by Tollway which had been paid off by other lenders, one of which was then the subject of a lawsuit in Du Page County.

■ Upon filing the subject counts, St. Paul engaged in extensive discovery relating to all transactions between Tollway and any of the codefendants or related persons. St. Paul deposed Tollway's officers and in September 1983 deposed Anderson. Immediately thereafter, St. Paul withdrew the conspiracy charges and filed its counts IV and V against Tollway alone. The trial court, in denying Tollway's motion for fees and costs, took into account both the nature and extent of Tollway's actual involvement with Anderson, and the surrounding facts, from which it determined that St. Paul's counsel could reasonably infer an even more extensive involvement between these parties. In arguing its motion, it was incumbent upon Tollway to meet the requirements of section 2—611 by demonstrating that St. Paul knew or reasonably should have known that its allegations relating to conspiracy to defraud were untrue. Inherent in the trial court's ruling is the finding that Tollway failed to meet that burden. We cannot say that such was an abuse of discretion, and, accordingly, we affirm the ruling of the trial court.

Affirmed.

McGLOON, P.J., and CAMPBELL, J., concur.