PAUL WILSON, Plaintiff-Appellant, v. C. W. MOORE *et al.*, Defendants-Appellees.
Fifth District   No. 5—85—0397

Opinion filed March 11, 1987.

WELCH, J., dissenting.

Edward J. Kionka, of Winters & Garrison, of Marion, for appellant.

W. A. Armstrong, of Mitchell & Armstrong, Ltd., of Marion, for appellees.

PRESIDING JUSTICE KARNS delivered the opinion of the court:

Defendants, C. W. and Mary Jo Moore, husband and wife, are builders and vendors of houses. Plaintiff, Paul Wilson, is a real estate broker and salesman. Defendants and plaintiff entered into an oral agreement whereby plaintiff would attempt to sell a new house built by defendants. Defendants were to pay plaintiff a commission on sale. Plaintiff procured buyers for the property, Charles and Sue Phemister. At closing, the buyers tendered their personal check for the purchase price. Plaintiff accepted the check and gave defendants a check drawn on his escrow account for the sale proceeds less his commission. The buyer's check was dishonored. Plaintiff brought this action against defendants to recover the amount of his check. After a bench trial in the circuit court of Williamson County, judgment was entered for defendants. Plaintiff appeals.

The trial court made detailed findings of fact and concluded that there was no disagreement between the parties as to the essential facts; we agree.

Plaintiff was a broker of much experience. The sales contract between the defendants and the Phemisters was procured by Helen Keay Greenwood, a salesperson who worked in plaintiff's business. Plaintiff and Greenwood had both sold other houses for defendants. A form "listing agreement" was filled out but not signed, and neither party contends the written terms of that form set forth the agreement of the parties. The agreed commission for sale of the real estate in question was $5,000.

In September of 1983, Greenwood located prospective purchasers, Charles and Sue Phemister, who stated they wanted the house for Mrs. Phemister's mother and grandmother. On September 20, 1983, the Phemisters and defendants signed a contract for sale of the real estate, providing for closing on September 30, 1983. The contract provided for the Phemisters' deposit of $5,000, and required defendants to make certain alterations in the house, including two additional doors and one additional concrete walkway. The Phemisters' $5,000 check was never cashed because the Phemisters stated at the time of delivery that there

were not sufficient funds in the Phemisters' account to cover the check but funds would be shortly forthcoming.

The Phemisters were not able to close on September 30, 1983, nor on many subsequent agreed closing dates. Greenwood had the most contact with the Phemisters, especially Mrs. Phemister, and Greenwood relayed the Phemisters' various excuses to plaintiff and defendants. Greenwood had attended high school with both of the Phemisters, but she knew Mrs. Phemister better than Mr. Phemister, who was older, and the trial court found she "vouched for the integrity of the Phemisters." According to Greenwood, in September of 1983 the Phemisters told her they had won a lawsuit and were to receive millions of dollars, from which funds they would purchase the house. The Phemisters blamed much of the subsequent delay on court proceedings and legal problems delaying distribution of their funds. Many of the excuses in retrospect would appear fanciful, but they need not be detailed here. At one point the Phemisters agreed to pay defendants their interest costs from October 1, 1983, to closing, in exchange for keeping the house available to them.

Mrs. Moore kept a written record of the Phemisters' excuses, communicated to defendants by Greenwood and by the Phemisters. Near the end of February 1984, Mrs. Phemister phoned Mr. Moore and told him they would miss another closing date because Mr. Phemister could not fly out of St. Louis to New York (apparently to pick up the Phemisters' funds) as the airport was closed because of snow and Mr. Phemister was on stand-by for the next-day flight. Mrs. Moore testified she phoned the airport and was told there were flights to New York that day, with plenty of seats and no stand-by list. This was the only attempt on anyone's part to verify the numerous excuses offered by the Phemisters.

At this point defendants insisted the Phemisters pay for the house by March 16, 1984. However, the sale of houses was slow in the area at that time, and defendants ultimately agreed to meet the Phemisters for a closing on March 22, 1984. On that date plaintiff, Greenwood, defendants, and Mrs. Phemister met at plaintiff's office. Mrs. Moore testified when Greenwood phoned and told her to come to the office that day, she, Mrs. Moore, asked Greenwood whether she had asked the Phemisters if they had a cashier's check, to which Greenwood replied she had not asked. According to defendants they did not trust the Phemisters at this point. Because of the many delays and excuses, the defendants had insisted repeatedly to plaintiff that the Phemisters pay with cash or cashier's check or else that they be paid directly by plaintiff.

At the March 22, 1984, closing, Mrs. Phemister told the others

present that her husband was waiting for a phone message that their funds had been transferred to a local bank in Mt. Vernon from New York. After Mr. and Mrs. Phemister spoke on the phone several times, Mrs. Phemister reported the funds had not been wired from New York prior to bank closing time, so the funds would not be at their disposal the next day, Friday, but would be available Saturday or Monday at the latest. Notwithstanding this announcement, the parties agreed to close. Defendants executed a deed transferring the real estate. Mrs. Phemister produced her checkbook and asked whom the payee should be. Mrs. Moore said to plaintiff, "Aren't you supposed to write us a check?" insisting, as she had for some time, that she receive cash or a cashier's check from the Phemisters or else plaintiff's check. Plaintiff said that was correct. Mrs. Phemister wrote plaintiff a check for $128,671.02, representing $120,000 purchase price, $5,000 broker's commission, $3,121.02 interest costs incurred by defendants since October 1, 1983, and $550 closing costs. Plaintiff wrote defendants a check for $123,121.02, the purchase price plus interest since October 1, 1983, which plaintiff said could be cashed the next day. Plaintiff told defendants they could consider the house sold and could pay their creditors now. Plaintiff also told defendants to cancel their insurance on the house and have the utilities taken out of their names. The next day, Friday, plaintiff saw Mr. Moore at the bank, paying off his debts.

The Wednesday following the closing, Mrs. Phemister phoned Greenwood and told her there was no money and had never been any, and "this whole thing had been a hoax." Greenwood informed plaintiff. On April 4, 1984, plaintiff asked defendants for his money back. Plaintiff testified he returned the deed and other documents executed by defendants to defendants, who refused to return the "proceeds of sale." Mr. Moore testified he now considers plaintiff the owner of the real estate. Mr. Moore testified on one occasion he was contacted regarding unmowed weeds on the property. Plaintiff has not received a deed to the real estate, although defendants have at all times been willing to execute any document necessary to place title in plaintiff's name.

Plaintiff commenced this action against defendants seeking "$123,121.02 together with interest thereon." After a trial, the court, in a considered opinion, found plaintiff failed to prove a mutual mistake of fact such as would entitle plaintiff to a refund of the money as the parties knew there was no money in the Mt. Vernon bank at time of closing and it is "speculation that money would eventually find its way into the bank in Mt. Vernon to satisfy the check."

■ The general rule under which plaintiff brings this action is that

money paid under a mistake of fact, which would not otherwise have been paid had the facts been known to the payor, may be recovered. That the person to whom the money was paid under a mistake of fact was not guilty of deceit or unfairness, and acted in good faith, does not prevent recovery of the sum paid, nor does negligence of the payor preclude recovery. (*Bank of Naperville v. Catalano* (1980), 86 Ill. App. 3d 1005, 1008, 408 N.E.2d 441, 444); the rule, however, as expressed in *Bank of Naperville* and numerous cases, applies only where the person receiving payment is not entitled to payment, as for instance in the cited case where the person paid had no account at the bank and the payment was charged to the account of a depositor with the same name.

The plaintiff has presented the issue as one involving mutual mistake of fact, that the Phemisters would make good on their promise to have adequate funds in the local bank in Mt. Vernon to cash the check given to plaintiff. However, the majority of this court does not view this as a case involving mistake of fact.

What this cause really involves is an unfortunate business transaction that did not meet the expectations of the parties, or at least one of the parties. The plaintiff here was simply willing to rely on the credit of the Phemisters in order to conclude a business transaction wherein he would earn a $5,000 real estate commission. The defendants made it clear to all parties throughout these protracted negotiations that they were not willing to rely on the Phemisters' promise to pay and would not extend them credit by accepting their personal check.

We are not dealing with a mistake of present or past fact but with the future expectation on the part of the plaintiff that the Phemisters would honor their promise to pay. Plaintiff knew that the Phemisters had no funds in their account in the Mt. Vernon bank at the time he accepted their personal check.

There was no mistake of existing fact at the time of closing. The subject matter of the real estate sales contract, the house, was in existence; good title was vested in defendants, and they had the ability to convey and did convey in accordance with the terms of the contract. At closing plaintiff stated that the matter was concluded; no escrow was established, although plaintiff testified he was well acquainted with this device. Plaintiff stated to defendants they were entitled to cash his check the next day and pay their debts associated with the construction of the house, which they did.

This is not a case involving money paid to another under a mistaken belief that the payee was entitled to the money. Thus in *Bank of Naperville v. Catalano* (1980), 86 Ill. App. 3d 1005, 408 N.E.2d 441,

the bank was allowed to recover in restitution money paid to a customer who had no right to receive it. The rules governing money paid by mistake are set out in sections 15 to 28 of the Restatement of Restitution (Restatement of Restitution secs. 15 through 28 (1937)). No example is given where a payor is entitled to restitution who relies on the credit of another and received a benefit in the form of consideration flowing to himself in the transaction and where the payee is entitled to receive payment.

We believe the rule is, before the payor may recover money paid by mistake, there must have been a mistaken belief that the money was due the payee when in fact it was not, or a mistaken belief that the payor had some legal obligation to make the payment. While no Illinois case can be found paralleling these somewhat unusual facts, support can be found in the case law of other jurisdictions. (See *e.g., Merchant's Insurance Co. v. Abbot* (1881), 131 Mass. 397; *Union Central Life Insurance Co. v. Glasscock* (1937), 270 Ky. 750, 110 S.W.2d 681.) We would emphasize, however, we do not view this as a case involving mistake of fact notwithstanding plaintiff's attempt to cast it in that mold by focusing our attention on the existence of the Phemisters' money in the bank in New York as a mutual mistake of fact. It turned out to be an error in judgment for plaintiff to rely on the credit of the Phemisters, something the defendants consistently refused to do. Reliance on future payment is not a present mistake of fact. It is certainly not a case of unjust enrichment, another traditional ground for restitution, as defendants were entitled to receive payment and substantially altered their position to their detriment upon receipt of payment, a matter we need not address for purposes of our decision.

The judgment of the circuit court of Williamson County is affirmed and the cause is remanded for the entry of appropriate ancillary relief to ensure that appellees execute any documents necessary to place title to the subject property in appellant.

Affirmed and remanded.

HARRISON, J., concurs.

JUSTICE WELCH, dissenting:

I respectfully dissent. In my opinion plaintiff has made out a plain case of unjust enrichment entitling him to restitution of the purchase price of the real estate. The judgment should be reversed.

The trial court concluded that there was no mutual mistake of fact, and that even if there had been a mutual mistake of fact, defendants

had substantially changed their position such that plaintiff's recovery of the payment would be inequitable. Both conclusions are contrary to settled principles of the law of restitution. The facts being essentially undisputed, the questions presented are questions of law, which this court should determine independently of the judgment of the trial court. *Lepkowski v. Laukemper* (1943), 317 Ill. App. 304, 314, 45 N.E.2d 979, 983.

The long-standing rule is that an action for money had and received is not only maintainable for mutual mistake of fact, but "is also maintainable for the recovery of money paid under a mistake, on the part of the *payer*, of a material fact." (Emphasis added.) (*Wolf v. Beaird* (1888), 123 Ill. 585, 590, 15 N.E. 161, 162; see *Bank of Naperville v. Catalano* (1980), 86 Ill. App. 3d 1005, 1008, 408 N.E.2d 441, 444; *Board of Education v. Holt* (1976), 41 Ill. App. 3d 625, 626, 354 N.E.2d 534, 535.) That the person to whom the money was paid under a mistake of fact was not guilty of deceit or unfairness, and acted in good faith, does not preclude recovery of the sum paid, nor does negligence of the payor preclude recovery. (*Bank of Naperville v. Catalano* (1980), 86 Ill. App. 3d 1005, 1008, 408 N.E.2d 441, 444; *Board of Education v. Holt* (1976), 41 Ill. App. 3d 625, 626, 354 N.E.2d 534, 535.) The trial court's finding that there was no mutual mistake of fact was wrong. The court focused on the wrong facts. Plaintiff believed in the Phemisters' representation that they had funds to cover their closing check. If plaintiff had known at the time of the closing that the Phemisters did not have these funds, plaintiff would not have written his check to defendants. Under these circumstances, defendants ought not in equity and good conscience be allowed to retain the benefit of plaintiff's payment to them. Plaintiff's good-faith belief that the Phemisters had the funds they said they had justifies restitution, even if his failure to discover the true facts of the situation was negligent and even if defendants were innocent of any wrongdoing or contributing to plaintiff's mistake. *Bank of Naperville v. Catalano* (1980), 86 Ill. App. 3d 1005, 408 N.E.2d 441; *Board of Education v. Holt* (1976), 41 Ill. App. 3d 625, 354 N.E.2d 534.

Moreover, the pure equities of the case require restitution. If plaintiff had not given defendants his own check, defendants would have either had to accept the Phemisters' personal check or require the Phemisters to present a cashier's check. The personal check was worth nothing because of insufficient funds, and for the same reason the Phemisters could not give a cashier's check. If plaintiff had not given defendants his check, there would have been no closing and defendants would have received nothing.

As it happened, defendants received $123,121.02 and plaintiff received nothing. Defendants cashed plaintiff's check. The unrecorded title documents, made out to the Phemisters, were returned to defendants when it became apparent the Phemisters' check would not clear. Thus the present status of the parties is that defendants have plaintiff's $123,121.02 *and* the property. Plaintiff has nothing, and he has lost $123,121.02. Where one person has received money which belongs to another, under circumstances that in equity and good conscience he ought not to retain it, recovery will be allowed in equity. *Board of Trustees v. Village of Glen Ellyn* (1949), 337 Ill. App. 183, 194-95, 85 N.E.2d 473, 479.

The trial court erred in finding defendants had substantially changed their position. The trial court found that even if there was a mutual mistake of fact, restitution was inequitable because defendants substantially changed their position in four ways: (1) the title to the property had passed to the Phemisters; (2) the proceeds from plaintiff's check had been paid to defendants' creditors; (3) defendants gave up their cause of action against the Phemisters for breach of the sales contract; and (4) defendants gave up the $5,000 earnest money. None of these qualifies as change of position under the *law*. While *under certain circumstances* defendants' irrevocable change of position in reliance on plaintiff's payment would preclude restitution, the change of position must have been caused by the payment and must have been a legally material and irrevocable change. *St. Paul Federal Savings & Loan Association v. Avant* (1985), 135 Ill. App. 3d 568, 577, 481 N.E.2d 1050, 1056-57.

Title to the property had not passed to the Phemisters. Defendants signed the title documents at plaintiff's office during the closing and left the documents with plaintiff as defendants' agent. However, plaintiff did not deliver the documents to the Phemisters, but kept them and did not record them while he waited for the Phemisters' check to clear. When the check failed to clear and it became apparent that there would be no money deposited in Mt. Vernon, plaintiff returned the documents to defendants. Under these circumstances, title never passed to the Phemisters, but remained in defendants. Mere delivery of a deed into escrow does not convey title, when the conveyance is contingent upon the occurrence of an event that entitles the grantee to possession of the deed. (*Fairbury Federal Savings & Loan Association v. Bank of Illinois* (1984), 122 Ill. App. 3d 808, 811-12, 462 N.E.2d 6, 9.) Here the conveyance of title was contingent upon the clearance of the Phemisters' closing check. When that event did not occur, and the documents were not recorded, title did not pass. None of the parties could have

believed title had passed to the Phemisters. Therefore, the trial court's finding that title had passed from defendants to the Phemisters was erroneous.

The trial court erred in finding the payment of the proceeds of plaintiff's check to defendants' creditors justified a denial of restitution. At trial, Mr. Moore testified he cashed plaintiff's check and used that money to pay off various debts associated with the construction of the house. He stated his creditors would not give back the money so he could repay plaintiff. Whether defendants could recover the actual funds from their creditors is immaterial. Defendants received a benefit which, but for plaintiff's mistake of fact, they would not have received. Where once they owned a house subject to claims by subcontractors and other creditors, at the time of trial they owned a house free and clear of any claims. Other debts incurred to finance the house and lot were also paid with plaintiff's check. This benefit amounted to $123,121.02, the amount paid by plaintiff. Thus, the property in question (theoretically at least) should now be worth $123,121.02 more than before plaintiff wrote his check. Under these circumstances, defendants' use of the funds would not have made it inequitable to require defendants to repay plaintiff. If defendants did not have the funds readily available, they could have mortgaged the property for the amount of cash required, and both parties would have been in essentially the same positions as before payment was mistakenly made.

The receipt of a payment made under a mistake of fact does not usually make out a defense to the payor's claim for restitution merely by proving that he spent the money in question or that he used it to pay his debts. In *Donner v. Sackett* (1916), 251 Pa. 524, 97 A. 89, the Pennsylvania Supreme Court rejected the defendant's argument that he could not return the money because he had used it to pay his debts.

> "True, [defendant] avers he used the money to pay some of his debts, but why he so avers we do not understand, for his duty was to pay his debts, whether he sold or kept the stock. It is not becoming that he asks to be relieved from paying back the money which he received by mistake for comparatively worthless stock, because he turned it over to a creditor.
>
> The case as presented by the record is a payment of money by the plaintiffs under a manifest mistake of fact, and it is equally clear, so far as can be gathered from the record, that the defendant will sustain no damage if he is compelled to repay it to them. In all good conscience they are entitled to it; with no good conscience can he hold onto it, and the law requires him to return it." 251 Pa. 524, 528, 97 A. 89, 90.

Similarly, in *Messersmith v. G. T. Murray & Co.* (Wyo. 1983), 667 P.2d 655, the Wyoming Supreme Court rejected the defendant's argument that it had materially changed its position in reliance upon the plaintiffs' mistaken payment by applying the proceeds to bills and a down payment on a house. The Wyoming court reviewed the rules regarding the defense of change of position, holding that to constitute such a change, the burden is on the payee to show that the change has been detrimental to the payee and that it was material and irrevocable such that the payee cannot be returned to the status quo. However, the court pointed out, a mere change in the form of the proceeds does not qualify when the payee has retained the value. Accordingly, the court found the defendants had not suffered a loss of value, either by paying off their debts or by applying some of the proceeds to a down payment on a house. The court concluded no change of circumstances was established. 667 P.2d 655, 658. Accord, *Westamerica Securities, Inc. v. Cornelius* (1974), 214 Kan. 301, 307, 520 P.2d 1262, 1269-70; *First National City Bank v. McManus* (1976), 29 N.C. App. 65, 71-72, 223 S.E.2d 554, 558-59.

In *Merchant's Insurance Co. v. Abbott* (1881), 131 Mass. 397, Abbott's insurer paid Abbott's claim on a loss resulting from fire to his assignee. Both the assignee and the insurer were innocent of the fact that Abbott had intentionally set the fire and thereby voided his insurance policy. The Massachusetts court held that the insurer could recover the amount of the payment from Abbott:

> "There can be no doubt of the liability of Abbott in this action. If the money had been paid by the plaintiffs to him, it could be recovered back as money paid under the influence of a mistake between them and him as to the existence of a state of facts that would entitle him to the money. [Citations.] Although Abbott has not in fact received the money, the payment of the money by the plaintiffs at his request in discharge of his debt to the other defendants is equivalent to the receipt by Abbott of so much money, and is sufficient to enable the plaintiffs to maintain the action against him ***." 131 Mass. 397, 399.

In *Merchant's Insurance Co. v. Abbott*, the defendant had not received payment from the plaintiff directly, but had requested the plaintiff to pay off certain debts on his behalf. The court emphasized this was tantamount to the defendant's receiving the payment himself and applying it to his debts. Such are the facts in our case. Plaintiff recognizes that he has no claim against the creditors who eventually received payment from defendants. As in *Merchant's Insurance Co. v. Abbott*, defendants here benefited directly from, and in the same

amount as, plaintiff's mistaken payment. Therefore, it is equitable to require them to repay that amount.

In *Union Central Life Insurance Co. v. Glasscock* (1937), 270 Ky. 750, 110 S.W.2d 681, the plaintiff insurance company held a mortgage on a piece of property jointly owned by Beard and his brother. Glasscock wished to purchase the property and arranged to do so after Beard had reached an agreement with the insurance company to immediately pay off the mortgage with the proceeds of the sale to Glasscock. The sale went as planned, but three years later, Glasscock discovered there was a prior mortgage on the property which was superior to the insurance company's claim. Therefore, instead of taking the property free and clear of encumbrances, as both he and Beard had intended, he had taken the property subject to a substantial mortgage. Glasscock sued both Beard and the insurance company to recover the amount he had paid for the property. The Kentucky court, adopting the reasoning of the Massachusetts court in *Merchant's Insurance Co. v. Abbott* (1881), 131 Mass. 397, held Glasscock could recover from Beard, even though Beard had paid out the entire $1,900 purchase price to secure a release of the mortgage from the insurance company, but could not recover from the insurance company. The court affirmed the part of the trial court's judgment which required Beard to repay the $1,900 mistakenly paid by Glasscock, and the court put the parties in status quo by directing a cancellation of the deed made by Beard to Glasscock, revesting Beard with title.

Similarly, in our case, where defendants have used the money paid by plaintiff to obtain releases of construction liens or to pay off notes or other debts involved in the purchase or construction of the property, they should be required to repay plaintiff that amount which he mistakenly paid them and for which he received no benefit. As the courts have noted, one is always required to pay his debts. Such a payment cannot constitute a legal change of position, especially since the debt payor receives a monetary benefit (an increase in his net worth) exactly equal to the payment. In the instant case, since title never passed to plaintiff, it is unnecessary to require that the title be returned to defendants.

The trial court erred in finding that defendants gave up their cause of action for breach of contract against the Phemisters. There was no evidence offered that the statute of limitations had run on that cause of action. At no time did defendants grant the Phemisters a release from their contractual obligations. Defendants were free to pursue their claim against the Phemisters at any time. Since the sale contract was a written contract, defendants would have 10 years from the date of the

breach to bring an action on that contract. (Ill. Rev. Stat. 1983, ch. 110, par. 13—206.) Once the parties are placed in the status quo, defendants will have many years in which to bring their action against the Phemisters and make their claim for breach of contract and substantial damages.

Defendants in *Bank of Naperville v. Catalano* (1980), 86 Ill. App. 3d 1005, 1008, 408 N.E.2d 441, 444, similarly argued that they had made a change of position in reliance on the plaintiff's payment. There the change was the defendants' alleged failure to bring suit against the plaintiff. The appellate court rejected this argument, holding there was no evidence that the defendants had changed their position or suffered any permanent injury as a result of their alleged failure to sue the plaintiff. The court found that, since there was no allegation that the claim was barred by any statute of limitations, it must assume that the claim could be prosecuted in the future. Similarly here, plaintiff should have restitution and defendants should proceed with their claim against the Phemisters. Defendants have not substantially changed their position in that regard.

The trial court erred in finding that defendants changed their position by giving up the $5,000 earnest money in reliance on plaintiff's payment. This finding was not supported by evidence. Plaintiff testified, and no one disputed, that the Phemisters' $5,000 earnest money check was never deposited in escrow because the Phemisters informed him there were insufficient funds in their account. As the parties learned later, there was never to be any money in the Phemisters' account. Therefore, the earnest money check was worthless. Because it was never worth anything, defendants cannot be found to have forfeited anything by plaintiff's payment. Moreover, if defendants choose to pursue their claim for breach of contract against the Phemisters, this amount would be included in the claim for damages, as the contract price included the $5,000 earnest money sum.

In *St. Paul Federal Savings & Loan Association v. Avant* (1985), 135 Ill. App. 3d 568, 481 N.E.2d 1050, this court adopted the reasoning of *Grand Lodge, A.O.U.W. v. Towne* (1917), 136 Minn. 72, 161 N.W. 403. In *Grand Lodge, A.O.U.W. v. Towne*, a swindler procured loans from both the plaintiff and the defendant, secured by forged notes and mortgages. The plaintiff paid off the defendant's worthless mortgage in order to obtain a superior claim to the property, then sought to recover its payment to the defendant. The defendant argued that it had prejudicially changed its position when it canceled its note, in that it could no longer collect from the swindler. The court found that by receiving payment of his mortgage and giving up evidence of the sup-

posed debt, the defendant had lost nothing of value. If the plaintiff had not paid the defendant, the defendant would still be the holder of the forged note and mortgage, but nothing else in the way of satisfaction for the money procured of him through fraud. Therefore, the Minnesota court granted the plaintiff restitution.

Similarly, in *St. Paul Federal Savings & Loan Association v. Avant*, this court granted the plaintiff restitution in spite of the defendant's argument that it had prejudicially changed its position in reliance on the plaintiff's payment by canceling a note from one of its debtors. In *St. Paul Federal Savings & Loan Association v. Avant*, as here, both the plaintiff and the defendant were victimized by a third party. In *St. Paul Federal Savings & Loan Association v. Avant*, Anderson forged the names of the true property owners to a real estate contract and mailed this contract, together with a mortgage application for defendant Avant, to the savings and loan association. The savings and loan association granted the application and loaned Avant $62,300 to purchase the property, disbursing $51,350.66 of the loan to a second defendant, Tollway Arlington National Bank, to pay off Anderson's purported mortgage, also a forged document. The savings and loan association then sued both Avant and Tollway to recover the sums it had mistakenly paid. Tollway claimed that it should not be held liable, because it prejudicially altered its position in reliance on the savings and loan association's payment by canceling Anderson's mortgage. This court rejected that argument, adopting the rationale of the Minnesota court in *Grand Lodge, A.O.U.W. v. Towne*.

Our case is similar. The earnest money check, though not forged, was worthless, and the instant defendants lost nothing when plaintiff, as their agent, returned the check to the Phemisters in exchange for their closing check which included that amount.

In conclusion, plaintiff has shown by uncontradicted evidence a legally sufficient mistake of fact, and that nothing defendants did can be deemed a change of position sufficient to deny plaintiff recovery of his payment. Indeed, it is impossible to conclude that plaintiff would have given his check to defendants if he did not sincerely believe the Phemisters' funds did exist. Any result other than restitution would be grossly inequitable. It would give defendants a $123,121.02 windfall which they have done nothing to deserve. There is no justification in law or equity for enriching defendants by $123,121.02, or in requiring plaintiff to sustain a $123,121.02 loss. This judgment should be reversed.