In the
United States Court of Appeals
For the Seventh Circuit

No. 00-1960

Praxair, Inc.,

Plaintiff-Appellant,

v.

Hinshaw & Culbertson,

Defendant-Appellee.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 97 C 3079--Wayne R. Andersen, Judge.

Argued September 27, 2000--Decided December 20, 2000

Before Posner, Coffey, and Kanne, Circuit Judges.

Posner, Circuit Judge.  Praxair, the plaintiff in this diversity suit for legal malpractice governed by Illinois law, appeals from the grant of summary judgment to the defendant, Hinshaw & Culbertson ("Hinshaw" for short), its former law firm. Praxair (actually a predecessor corporation, but we'll suppress that detail for the sake of simplicity) was the defendant in a breach of contract suit brought by Credit Agricole, a French bank. That suit, in which Praxair was represented by Hinshaw, ended in a judgment for Credit Agricole of almost $4 million, which we affirmed in Caisse Nationale de Credit Agricole v. CBI Industries, Inc., 90 F.3d 1264 (7th Cir. 1996). In granting summary judgment in the present case, the district judge ruled that Praxair had failed to show that, had it not been for Hinshaw's alleged malpractice, Caisse Nationale would have been decided differently. In other words, Praxair had failed to show that the malpractice had made it any worse off, and if that is right then of course the Hinshaw firm has no tort liability.

Credit Agricole's suit had grown out of a swap contract that it had made with Praxair on February 18, 1991. The contract was negotiated by the New York and Illinois offices of Credit Agricole and the Illinois office of Praxair. During the term of the contract, which was to

expire on January 16, 1994, Praxair was to pay Credit Agricole interest at a fixed rate on $35 million (Canadian, not U.S., dollars), while Credit Agricole was to pay Praxair interest at a variable rate, to be reset every three months, tied to the interest rate on Canadian bankers' acceptances (notes). The principal amount was purely notional; that is, it was not transferred, but was simply the base for calculating how much interest each party owed the other. The parties periodically netted their mutual obligations: if the variable rate had risen above the fixed rate, Credit Agricole paid Praxair; if the fixed rate had risen above the variable rate, Praxair paid Credit Agricole. Thus the swap shifted from Praxair to Credit Agricole the risk, both upside and downside, of interest-rate changes during the three-month periods between resettings of the variable rate.

Simultaneous with the swap, Praxair granted Credit Agricole an option, "exercisable between 9:00 a.m. and 5:00 p.m. EST up to and including January 16, 1994," to extend the swap for an additional two years on the basis of the Canadian bankers' acceptance rate on that day. We must mention one more wrinkle. To hedge the interest-rate risk that it was assuming, Credit Agricole made a swap with another bank, Bankers Trust. In that swap Credit Agricole committed to the fixed rate and Bankers Trust to the variable rate. Credit Agricole gave Bankers Trust an option to renew the swap that was essentially identical to the option that Praxair had given Credit Agricole; it too could be exercised up to and including January 16, 1994.

That day was a Sunday. The next day was a business day in Canada but a public holiday under both Illinois and New York law, and both states provide that a contractual obligation which comes due on a holiday may be performed on the next business day without loss of contract rights unless the parties provide otherwise either expressly or by implication. N.Y. General Construction Law sec. 25(1); 5 ILCS 70/1.11. The next business day was Tuesday, January 18. Credit Agricole attempted to exercise the option that day. Praxair took the position that this was too late, thus precipitating the suit by Credit Agricole that Praxair lost.

In that suit Hinshaw had moved for summary judgment on Praxair's behalf without conducting any discovery, discovery that would have brought to light documents suggestive that Credit Agricole itself may have believed that the swaption expired on January 16, not January 18. In support of the motion Hinshaw had submitted merely a skimpy memorandum of law that said

little more than that "the Option Agreement expresses the intent that The Option be exercised by 5:00 p.m. EST on January 16, 1994. It wasn't." The memorandum acknowledged, contradicting the flat statement that January 16 was the deadline, that the underlying swap agreement (as opposed to the swaption, that is, the option agreement) defined a "business day," as opposed to a holiday, for obligations denominated in Canadian dollars as any day that was a business day in Toronto, which January 17 was but January 16, a Sunday, was not. So any payments or resets scheduled for January 16 would not have to be made until the next day. But, Hinshaw argued, they could not be made any later than that. And so the specification of Toronto business days in the underlying swap contract was irrelevant because Credit Agricole had not attempted to exercise the option on January 17 but had waited until the next day. The district court, seconded by a panel of this court, found this argument unpersuasive because "the terms of the option contract evince no intent-- express or implied-- to alter the weekend/holiday rule" of New York and Illinois. Caisse Nationale de Credit Agricole v. CBI Industries, Inc., supra, 90 F.3d at 1274. Given the location of the offices in which the swaption was negotiated and signed, the governing rule had to be the law of one of these two states and it didn't matter which one because they had the same rule. Id. at 1271 n. 3.

 Praxair argues that Hinshaw could have made a much better argument for a January 16 or January 17 deadline and that had it done so this court would have reached a different result in the previous case. It is only the second proposition that is in issue here; the district court did not decide whether Hinshaw had actually been negligent. Negligent legal representation is a failure to meet minimum professional standards, e.g., Transcraft, Inc. v. Galvin, Stalmack, Kirschner & Clark, 39 F.3d 812, 815 (7th Cir. 1994); Bonhiver v. Rotenberg, Schwartzman & Richards, 461 F.2d 925, 928 (7th Cir. 1972), and is thus equivalent to what in Sixth Amendment cases is called ineffective assistance of counsel. Strickland v. Washington, 466 U.S. 668, 688 (1984); Lear v. Cowan, 220 F.3d 825, 829 (7th Cir. 2000); Hernandez v. Cowan, 200 F.3d 995, 999 (7th Cir. 2000); People v. Kluppelberg, 628 N.E.2d 908, 917 (Ill. App. 1993). It is not merely undistinguished representation. Restatement (Second) of Torts sec. 299A, comment e (1965). The summary judgment memorandum that Hinshaw filed in Caisse Nationale was that, and the failure to conduct any discovery may have been a worse lapse. If Praxair's allegations are credited, moreover, as the procedural posture of the case requires us to do, Hinshaw represented

itself as expert in complex financial matters. A law firm or other professional entity that represents itself to have special competence in a particular matter commits itself to a standard of care above the average for the profession as a whole. E.g., Transcraft, Inc. v. Galvin, Stalmack, Kirschner & Clark, supra, 39 F.3d at 815; Hays v. Sony Corp. of America, 847 F.2d 412, 419 (7th Cir. 1988); Sparks v. NLRB, 835 F.2d 705, 707 (7th Cir. 1987); Restatement (Second) of Torts, supra, sec. 299A, comment d; 2 Ronald E. Mallen & Jeffrey M. Smith, Legal Malpractice sec. 18.4 (4th ed. 1996). That is arguably what happened here, and we'll assume it is what happened here. A lawyer is not negligent for failing to make sophisticated economic arguments; few lawyers are capable of making such arguments. But a lawyer who holds himself out to his clients as being capable of making such arguments is bound to the standard of care of a lawyer having that capability. It is a case of tort law merging into contract law.

 We shall thus assume that Hinshaw was negligent and pass on to the issue of causation on which the decision of the district court and the appeal to this court are based. We'll also brush by Hinshaw's alternative ground for affirmance--that the two-year statute of limitations for bringing a suit for legal malpractice in Illinois (whose law the parties acknowledge governs the limitations issue) ran not from the judgment against Praxair in Caisse Nationale but from the grant of summary judgment against Praxair in that suit, which presaged its doom, or at the latest from the denial of Praxair's motion for reconsideration, filed by new counsel; for by that time it was apparent both that Hinshaw had fallen down on the job and that a final judgment adverse to Praxair was going to be entered. The general rule regarding malpractice claims based on the mishandling of litigation--and we consider it a sound rule as well as one binding on us in this diversity suit--is that the statute of limitations does not begin to run until the trial court enters a final judgment. Kaplan v. Shure Brothers, Inc., 153 F.3d 413, 420-21 (7th Cir. 1998); Lucey v. Law Offices of Pretzel & Stouffer, Chartered, 703 N.E.2d 473, 477-79 (Ill. App. 1998). The reason is not that it is certain then that the loser (the subsequent malpractice plaintiff) has been hurt, because he may get the judgment overturned on appeal; it is that it is too difficult to identify an earlier point at which he can be said to have been injured. Was it when his lawyer failed to raise a dispositive defense in the answer to the complaint? When he failed to object to a crucial bit of evidence? When he fainted during final argument? To avoid these conjectures and resulting uncertainty about

when the statute of limitations began to run, the courts give the malpractice plaintiff two years from the date on which the trial court entered the final judgment against him in the suit that he claims his lawyer booted.

So we come at last to the critical issue of causation. A plaintiff in a legal malpractice suit is not required to prove to a certainty that he would have won (or lost less) had it not been for the negligence of its lawyer, but he must show that a victory of some sort, even if just partial, was more likely than not. Jones Motor Co. v. Holtkamp, Liese, Beckemeier & Childress, P.C., 197 F.3d 1190, 1193 (7th Cir. 1999); Nicolet Instrument Corp. v. Lindquist & Vennum, 34 F.3d 453, 455 (7th Cir. 1994); Transcraft, Inc. v. Galvin, Stalmack, Kirschner & Clark, supra, 39 F.3d at 815; Glass v. Pitler, 657 N.E.2d 1075, 1081-82 (Ill. App. 1995). So we must consider how important the Hinshaw firm's oversights were. Several were due to its failure to conduct any discovery. Discovery is costly and in cases in which the stakes are small, or there is a clearly dispositive legal argument, forbearing to conduct discovery is not negligence. But the stakes were large in Credit Agricole's suit against Praxair, and while Hinshaw did make an argument that the case should be disposed of by reference to the "plain language" of the contract, which specified a deadline of January 16, the argument was hardly a killer, given the rule in force in both cities where the contract was negotiated that when a contract specifies performance on a legal holiday performance may be deferred to the next business day. 5 ILCS 70/1.11; N.Y. General Construction Law sec. 25(1); Caisse Nationale de Credit Agricole v. CBI Industries, Inc., supra, 90 F.3d at 1271-73; Hirsch v. Lindor Realty Corp., 472 N.E.2d 1024, 1025 (N.Y. 1984) (per curiam); Providence Ins. Co. v. LaSalle National Bank, 455 N.E.2d 238, 240-41 (Ill. App. 1983).

Even without conducting discovery, Hinshaw should have realized, as it surprisingly did not, that February 18, 1991, when the swap and swaption contracts were signed, was itself a holiday in New York and Illinois but a business day in Toronto. This fact implied, Praxair argues, that the parties had assumed that the next business day after January 16, 1994, would be January 17 because it would be a business day in Toronto albeit not in the U.S. states. And if even minimally sophisticated in complex financial transactions, rather than fully sophisticated as it is alleged to have told Praxair it was, Hinshaw would have realized that it was anomalous for January 17 to be a business day for purposes of the swap but not for purposes of the swaption.

Remember that the critical term of the swap if it was renewed, the variable-interest rate that Credit Agricole would be committing to, would be determined on January 17. This would give Credit Agricole, if free to postpone exercise of the swaption to the eighteenth, 24 hours in which to obtain and act on additional information about likely interest-rate movements in the next three months (that is, before the first resetting of the variable-interest rate under the renewed swap), while Praxair would have no corresponding right. Suppose that at 5 p.m. on Monday, January 17, the current interest rate for Canadian bankers' acceptances was 6 percent and, given that the rate was so high, Credit Agricole would not consider exercising the option to renew the swap, but that the next morning the rate plunged to 5 percent, at which level Credit Agricole would want to exercise; under its interpretation of the swaption it could do so because January 18 was the first business day after January 16. Now suppose the interest rate was only 5 percent on January 17 and rose the next morning to 6 percent; presumably Credit Agricole would not exercise the option. Credit Agricole, then, under its interpretation of the swaption, was in a heads I win, tails you lose position. It could, without any cost to itself, delay for 24 hours to see whether the interest rate fell. If it did fall, Credit Agricole would be better off if the swap was renewed; if the rate rose, it would be no worse off because it would be free to refuse to renew. Conversely, Praxair would be worse off if the interest rate fell but no better off if it rose. How likely is it that the parties would have agreed to so one-sided a deal?

Also without need to conduct discovery, but merely by reviewing Praxair's own records, Hinshaw would have discovered, first, that the original draft of the swaption, which had been drafted by Credit Agricole, had specified "NY Banking Day" but that Credit Agricole had deleted this in the draft it sent Praxair, and also that the original draft of the swap agreement had carried an expiration date of January 18 and this had been changed in the final draft to January 16.

Had Hinshaw conducted discovery, it would further have learned that when Bankers Trust had tried on January 18 to exercise the identical option to renew its swap with Credit Agricole, Credit Agricole, which had the same position in that swap as Praxair had in this one, had asserted that Bankers Trust was too late, though later it relented because Bankers Trust was a steady customer and Praxair was not.

Praxair argues that if all this evidence (and some other bits that we haven't mentioned but

that would make no difference to our decision) had been presented to the courts in Caisse Nationale, they would have ruled that a trial was necessary in order to determine whether the swaption allowed Credit Nationale to defer exercise to January 18. We disagree. When a contract specifies a day for performance that happens to be a Sunday or other legal holiday, performance can be deferred to the next business day in accordance with the law of the jurisdiction applicable to the contract. Nothing in the swaption itself or in the evidence painstakingly gathered by Praxair in this malpractice suit suggests that Credit Agricole thought it had to exercise the option by the close of business on January 17. True, Credit Agricole took this position when Bankers Trust tried to exercise its own option on the eighteenth. But that was because it didn't want to renew its swap with Bankers Trust if, as Praxair was asserting, Credit Agricole had lost the right to renew the swap with Praxair, the swap for which Credit Agricole's swap with Bankers Trust was a hedge. Praxair does not argue that Credit Agricole was barred by the doctrine of "mend the hold" from changing its position. Gibson v. Brown, 73 N.E. 578, 582 (Ill. 1905); Herremans v. Carrera Designs, Inc., 157 F.3d 1118, 1123 (7th Cir. 1998); Harbor Insurance Co. v. Continental Bank Corp., 922 F.2d 357, 362-63 (7th Cir. 1990); Robert H. Sitkoff, Comment, "'Mend the Hold'" and Erie: Why an Obscure Contracts Doctrine Should Control in Federal Diversity Cases," 65 U. Chi. L. Rev. 1059 (1998). Nor is this a case of extrinsic ambiguity, that is, a case in which knowledge of the real-world context of a contract shows that the parties did not mean what the contract, read acontextually, seems to mean. Allendorf v. Daily, 129 N.E.2d 673, 680 (Ill. 1955); Interim Health Care of Northern Illinois, Inc. v. Interim Health Care, Inc., 225 F.3d 876, 879, 881-82 (7th Cir. 2000); Rossetto v. Pabst Brewing Co., 217 F.3d 539, 542-43 (7th Cir. 2000); AM Int'l, Inc. v. Graphic Management Associates, Inc., 44 F.3d 572, 575 (7th Cir. 1995); International Union, United Automobile, Aerospace & Agricultural Implement Workers v. Skinner Engine Co., 188 F.3d 130, 145-46 (3d Cir. 1999); Charter Oil Co. v. American Employers' Insurance Co., 69 F.3d 1160, 1167-68 (D.C. Cir. 1995). It was to Credit Agricole's advantage to be able to exercise the swaption as late as January 18, given that the Toronto exchange would be open the previous day. Its interpretation is thus concordant with the real-world setting of the contract.

Specifically, it is not a case of mutual mistake (on which see, e.g., Barker v. Fitzgerald, 68 N.E. 430 (Ill. 1903); Grun v. Pneumo Abex Corp.,

163 F.3d 411, 421 (7th Cir. 1998)), a subdivision of extrinsic ambiguity well illustrated by the famous case of Raffles v. Wichelhaus, 2 H. & C. 906, 159 Eng. Rep. 375 (Ex. 1864). The contract in that case referred to the ship Peerless and each party had a different ship of that name in mind. The ambiguity was not on the face of the contract but in the relation between the words of the contract and the world of ships. Litigation might have established that the parties had in fact the same ship in mind. In that event there would have been no mutual mistake, in fact no mistake at all.

The doctrine of mutual mistake is limited to cases in which both parties were reasonable in their inconsistent interpretations; cases, in other words, of irremediable ambiguity; more precisely, cases in which neither party is more at fault than the other. "If neither party can be assigned the greater blame for the misunderstanding, there is no nonarbitrary basis for deciding which party's understanding to enforce," so either party is allowed to abandon the contract without liability. Colfax Envelope Corp. v. Local No. 458-3M, Chicago Graphic Communication Int'l Union, 20 F.3d 750, 753 (7th Cir. 1994); see also Miller v. Taylor Insulation Co., 39 F.3d 755, 760 (7th Cir. 1994). But a party whose interpretation is a product of carelessness cannot obtain relief unless the other party was equally careless, for without an equality of blame there is no basis for shifting the loss by permitting rescission. Id.; Colfax Envelope Corp. v. Local No. 458-3M, Chicago Graphic Communication Int'l Union, supra, 20 F.3d at 754. Professor Farnsworth cites authority that lack of care does not bar a claim of mutual mistake. E. Allan Farnsworth, Contracts sec. 9.3, p. 630 (3d ed. 1999). But an asymmetrical lack of care does. If one party is careless and the other is not, the careless party cannot rescind, because he has offered no reason why the court should make him better off than his opponent.

Praxair was careless. It had only to look at the calendar and know a minimum amount of choice of law and of contract holiday-performance law in order to realize that Credit Agricole could exercise the swaption on January 18. It failed to ascertain when it entered into the swaption contract back in 1991 that January 16, 1994, would be a Sunday and January 17 a holiday and failed (whether through ignorance of what day of the week that date was or through some other lack of care) to insist that the swaption nevertheless specify a deadline of January 17 for its exercise.

In contrast, Credit Agricole was not careless.

Indeed, it may well have thought it had until January 18 to exercise, in which event this is not a case of mutual mistake for a more fundamental reason than any we have touched upon. When only one of the contracting parties was mistaken, we have a case of unilateral rather than mutual mistake. And unilateral mistake is generally not a ground for rescinding or reforming a contract. Tony Downs Foods Co. v. United States, 530 F.2d 367, 373 (Ct. Cl. 1976); Anderson Brothers Corp. v. O'Meara, 306 F.2d 672, 676-77 (5th Cir. 1962). That is implicit in the doctrine of mutual mistake as we have explained it. Exceptions are cropping up, as discussed in Farnsworth, supra, sec. 9.4, but are inapplicable when the other party reasonably relied on the mistaken interpretation of the party seeking rescission. Id., sec. 9.4, pp. 632-33. Credit Agricole reasonably relied on its right to exercise on January 18. The contract seemed clearly to confer that right upon it. In any event, Illinois flatly bars rescission on the basis of a careless mistake. Rakowski v. Lucente, 472 N.E.2d 791, 794 (Ill. 1984); John J. Calnan Co. v. Talsma Builders, Inc., 367 N.E.2d 695, 698 (Ill. 1973); Steinmeyer v. Schroeppel, 80 N.E. 564 (Ill. 1907).

 Perhaps the strongest evidence that the mistake may have been mutual rather than unilateral is that an early draft of the proposed swaption agreement, submitted by Credit Agricole, set the expiration date at January 18. Praxair objected, insisting that the contract expire on Sunday the sixteenth. Credit Agricole relented, and the contract as finally executed listed that date. We say it is "perhaps" the strongest evidence because the record does not contain that early draft, only a description of it by an employee of Praxair in his deposition. But, if true, it implies that both parties thought they were choosing a date other than the eighteenth. That they knowingly chose a Sunday for expiration implies that they either wanted it to expire then or thought it would expire the next day, the seventeenth, perhaps overlooking the fact that the seventeenth was a public holiday in the United States. If both parties thought the contract would expire on either the sixteenth or the seventeenth but overlooked the fact that the seventeenth was a holiday, this would be a case like Raffles, where the contract though seemingly clear is actually incurably ambiguous because its unambiguous language fails to distinguish between two states of the world (business days and holidays). And then Hinshaw's negligence in failing to conduct discovery that would have brought these facts to light would be causally related to Praxair's loss of its lawsuit with Credit Agricole.

The difficulty with this argument for reversal is that Praxair hasn't made it. As noted earlier, it argues only that the parties changed the expiration date of the swap from January 16 to 18, not the swaption. If anything, that change, with no corresponding change in the expiration date of the swaption, would imply that the latter date was indeed the eighteenth, and not the seventeenth or sixteenth. Now in fact the expiration date of the swaption was changed too. But Praxair does not argue this. Even its argument, in any event unconvincing, about the change in the expiration date of the swap comes too late to be considered. It was not made in the district court or in Praxair's opening brief in this court. It was first made in Praxair's reply brief. For all we know, Credit Agricole has a compelling response. It has not had a chance to respond. Foreclosing the opponent's possibility to refute an argument by failing to present the argument in the trial court is one reason why an argument must, with exceptions not applicable here (jurisdictional arguments, comity arguments, and, very occasionally, arguments of pure law, Amcast Industrial Corp. v. Detrex Corp., 2 F.3d 746, 749 (7th Cir. 1993)), be made in the district court to be preserved in the court of appeals. E.g., Opp v. Wheaton Van Lines, Inc., 2000 WL 1648903, at *5 n. 2 (7th Cir. Nov. 3, 2000); Herremans v. Carrera Designs, Inc., supra, 157 F.3d at 1122; Wikberg v. Reich, 21 F.3d 188, 191 (7th Cir. 1994); Clauson v. Smith, 823 F.2d 660, 666 (1st Cir. 1987).

Praxair argues rather pathetically that as this was its first swap it should be excused by its lack of the relevant commercial sophistication from bearing the responsibility for the disaster it failed to foresee. But a contracting party, here Credit Agricole, is not to be penalized for knowing more about the business that is the subject matter of the contract than the other party. A newcomer to a market is responsible for learning enough about the market to be able to survive in it; he cannot force his contracting partners to educate him. See Sun Oil Co. v. Wortman, 486 U.S. 717, 731 n. 4 (1988); Western Industries, Inc. v. Newcor Canada Ltd., 739 F.2d 1198, 1202 (7th Cir. 1984); Gord Industrial Plastics, Inc. v. Aubrey Manufacturing, Inc., 469 N.E.2d 389, 392 (Ill. App. 1984); Farnsworth, supra, sec. 7.13, p. 486; Restatement (Second) of Contracts sec. 221 and comment a (1981); Elizabeth Warren, "Trade Usage and Parties in the Trade: An Economic Rationale for an Inflexible Rule," 42 U. Pitt. L. Rev. 515 (1981). This rule makes especially good sense when it is obvious that the market is a complicated one. Everyone knows or should know that swaps are not for novices. Praxair was careless in thinking it

could negotiate the shoals of swapdom without bothering to acquaint itself with the norms and customs, the traps and pitfalls, of the market into which it had wandered. Failing to exercise due care, Praxair had no basis in law for shifting the consequences of that failure to Credit Agricole. Better representation would not have saved it from a judgment in Credit Agricole's favor for breach of contract.

Praxair argues alternatively that at the very least Hinshaw should have advised it that it had no defense against Credit Agricole in time to allow Praxair to settle the suit, at a lower cost than it incurred by going all the way to judgment, simply by allowing Credit Agricole to exercise the option, which it turns out would have been worth less than the judgment that Credit Agricole obtained. But Praxair had refused to allow that exercise before it even hired Hinshaw. The refusal was a repudiation of the contract, entitling Credit Agricole to sue. Having broken the contract, Praxair had no right to insist that Credit Agricole comply with it.

Affirmed.