# In the
# United States Court of Appeals
## For the Seventh Circuit

_____

Nos. 04-2704 & 04-2705

IN RE: UAL CORPORATION, *et al.*,

*Debtors*.

APPEAL OF: U.S. BANK NATIONAL ASSOCIATION.

_____

Appeals from the United States District Court for
the Northern District of Illinois, Eastern Division.
Nos. 04 C 0067, 04 C 0442—**John W. Darrah**, *Judge*.

_____

ARGUED FEBRUARY 11, 2005—DECIDED JUNE 14, 2005

_____

Before BAUER, POSNER, and KANNE, *Circuit Judges*.

POSNER, *Circuit Judge*.    This is a tangled appeal (one appeal, not two—No. 04-2705 is an improper cross-appeal, because it seeks no change in the judgment; it is hereby dismissed) in the United Air Lines bankruptcy.

When United declared bankruptcy on December 9, 2002, under Chapter 11 of the Bankruptcy Code (reorganization), most of the airplanes that it was operating—some 460—were leased rather than owned. A special provision of the Bankruptcy Code, 11 U.S.C. § 1110, limits the rights of the owners of leased airplanes. The airline debtor can prevent

the owners from repossessing them if within 60 days of declaring bankruptcy it cures any defaults that may have arisen before the declaration, that is, any unpaid prepetition debt owed under the leases. The airline will do this if it thinks that continuing to operate a particular leased plane will yield more revenues than it will impose costs, including the cost of any payments past due under the lease. If not, one might think, the airline will abandon the lease, as it is expressly entitled to do. 11 U.S.C. § 365(a). But matters are more complicated. There are different types of "deficit-value" airplane leases. In particular, if no payments are past due when bankruptcy is declared—which United mistakenly believed to be true of the three leases at issue—the airline can prevent the owner of the plane from repossessing it without laying out any cash, and may do that in order to place pressure on the owner to renegotiate the lease. The owner, too, may prefer renegotiation to repossession because it may be difficult to find another lessee. Jeffrey W. Gettleman, "Restructuring Aircraft Fleets Under Section 1110 of the Bankruptcy Code: Selected Issues," 19—WTR *Air & Space Law.* 13, 14 (2005); Jeanne L. Schroeder & David Gray Carlson, "Airplanes in Bankruptcy," 3 *J. Bankr. L. & Prac.* 203, 203-04 (1994).

Airplane leases are complex, and although United assigned at least 20 people to study the documents and advise it which leases to abandon and which to keep, the task was hard to complete within the 60-day limit. In its haste the study team made a bad mistake. With respect to three "deficit-value" planes owned by trusts administered by U.S. Bank, the team, believing no money was owed the lessors, advised United's management not to abandon the leases. So on February 7, 2003, the sixtieth day after the declaration of bankruptcy, United notified the bank that it would not be abandoning them. In fact it owed several million dollars on

the leases. Thinking no money was owed, it did not accompany its notice of retention of the leases with any payment. But the bank, upon receiving United's notice but no check, knew that something was amiss—for February 7 was the deadline for curing any defaults, and unlike United the bank realized that payment was past due on those leases. The bank could thus have repossessed the planes, but, consistent with the point noted above, it didn't want to. It wanted to enforce United's mistaken election to honor the leases and the concomitant duty to cure the defaults. It wanted money, not planes.

United's decision to retain the three leases had been approved in an order issued by the bankruptcy court. To fend off the bank's demand for payment of money due under retained as distinct from abandoned leases, United had to file a motion to vacate the order. It did so. The ground was excusable neglect in having failed to abandon the leases. Excusable neglect is one of the grounds that Fed. R. Civ. P. 60(b)(1) recognizes for vacating a judgment, and Fed. R. Bankr. P. 9024 applies Rule 60(b) to bankruptcy orders.

The bankruptcy court granted the motion to vacate its earlier order. The bank appealed to the district court, which however dismissed the appeal on the ground that the bankruptcy court's order was not final. The district court could have exercised its discretion under 28 U.S.C. § 158(a) to entertain an interlocutory appeal from the bankruptcy court's order, but it declined to do so. The bank has appealed the dismissal, contending that the bankruptcy court's order was final and so the district court was wrong to dismiss the appeal. If the bank is right about appealability, we still could duck the merits of the appeal by remanding the case to the district court for that court to determine them. But

that would create unnecessary delay in resolving the controversy, since the merits have been fully briefed.

United argues that the bankruptcy court's order is not final, even in the attenuated sense that "finality" bears in the bankruptcy context, because it doesn't determine the bank's status as a creditor of United definitively. In a strict sense a Chapter 11 bankruptcy is not final until a plan of reorganization is confirmed. But as soon as the right of a particular creditor is determined, the ruling determining that right is appealable, although until the plan is confirmed there will be uncertainty concerning how much of his right he will actually be able to enforce. *Bank of America, N.A. v. Moglia*, 330 F.3d 942, 944 (7th Cir. 2003); *In re Szekely*, 936 F.2d 897, 899-900 (7th Cir. 1991). The ruling might determine that the debtor owed him $1 million, yet in the reorganization he might be given securities in the reorganized firm worth only $10,000. But if all appeals had to wait until the plan was confirmed, it would have to be redone if any of the appeals succeeded in altering the determination of entitlements. As we explained in the *Szekely* case, "a judgment does not lose its finality merely because there is uncertainty about its collectibility, corresponding to uncertainty about how many cents on the dollar the creditor will actually receive on his claim once all the bankrupt's assets are marshaled and compared with the total of allowed claims, and the priorities among those claims are determined. Thus the fact that the bankruptcy proceeding continues before the bankruptcy judge does not preclude treating an interlocutory order by him—interlocutory in the sense that it does not terminate the entire proceeding—as final for purposes of appellate review. (And if it is final for those purposes, then so is the district court's affirmance of his order.)" *Id.* at 899.

By allowing United to rescind the election, the bankruptcy court's order disentitles the bank to immediate payment of

the debt that United owes on the leases. The bank still has a claim to the money, of course, but a claim that does not enjoy the priority of an administrative expense, as it would if it were based on breach of a provision of a lease that, rather than being abandoned, had continued in effect after the declaration of bankruptcy, just as if it had been a brand-new postpetition lease. *In re Trans World Airlines, Inc.*, 145 F.3d 124, 142 (3d Cir. 1998); *In re Airlift Int'l, Inc.*, 761 F.2d 1503, 1508-10 (11th Cir. 1985); see 11 U.S.C. § 503. The order thus fixed the bank's status as a creditor, determining both the amount due it and the priority of its claim.

True, the bank's status may change between when the order was issued and when the plan of reorganization is confirmed. Suppose United decides it wants to keep one or more of the three planes in service under the existing lease terms, after all; it can still do so as long as the lessors have not yet repossessed the planes (they haven't) or the plan of reorganization has been confirmed (it hasn't), though it would have to pay off the prepetition debt first. 11 U.S.C. § 365(d)(2); *In re Trans World Airlines, Inc.*, *supra*, 145 F.3d at 137; *In re Airlift International, Inc.*, *supra*, 761 F.2d at 1508. But such possibilities exist in any protracted reorganization. That changing economic conditions may cause the debtor and his creditors to renegotiate their relationship does not defeat finality—and for a practical reason illustrated by this case: until the bank's entitlement to the millions in prepetition debt is determined definitively, that is, until the parties have exhausted their appellate remedies, it will be difficult for them to negotiate revised lease terms because of uncertainty as to what their existing rights are. See *In re Kilgus*, 811 F.2d 1112, 1116 (7th Cir. 1987); *In re Exennium, Inc.*, 715 F.2d 1401, 1403 (9th Cir. 1983); *St. Regis Paper Co. v. Jackson*, 369 F.2d 136, 141-42 (5th Cir. 1966). If United has to pay the prepetition lease debts, it might as well continue

under the leases; for then the cost of those debts will be a sunk cost—a cost incurred whether or not United operates the planes. We know that United had decided that if that cost were disregarded, as it would have to be if it could not be avoided, the leases would be worth holding onto. But if United can avoid having to pay the lease debts by abandoning the leases, as the bankruptcy court ruled it could do, then it will abandon them unless the lessors agreed to modify the terms of the leases. United's decision whether to retain or abandon the leases thus depends critically on the validity of the ruling that the bank appealed.

We conclude, therefore, that the bankruptcy court's order was sufficiently final to be appealable. *Trustees of Pension, Welfare & Vacation Fringe Benefit Funds of IBEW Local 701 v. Pyramid Electric*, 223 F.3d 459, 463-64 (7th Cir. 2000); *In re Urban Broadcasting Corp.*, 401 F.3d 236, 246-47 (4th Cir. 2005); *In re Fowler*, 394 F.3d 1208, 1210-11 (9th Cir. 2005). So we can move on to the merits. We agree with the bankruptcy court that this is a case of excusable neglect within the meaning of Rule 60(b). United's mistake in failing to abandon the leases was excusable, but not because their number and complexity and the 60-day deadline for sorting through them and figuring out which to abandon and which to keep made mistakes inevitable. That would make it a case not of excusable *neglect*, but of unavoidable error. See *Pioneer Investment Services Co. v. Brunswick Associates Limited Partnership*, 507 U.S. 380, 394-95 (1993). United is a huge company represented by one of the nation's largest law firms (Kirkland & Ellis). Sixty days in which to sort through some 460 leases requires examining on average fewer than eight leases per day, and all that had to be determined was whether United owed any money on the lease; if it did, it would abandon the lease and if not, not.

Had the beneficiaries of the mistake, the airplanes' owners, relied to their detriment on it, United would not be entitled to relief. *General Electric Capital Corp. v. Central Bank*, 49 F.3d 280, 284-86 (7th Cir. 1995); *Equilease Corp. v. Hentz*, 634 F.2d 850, 854 (5th Cir. 1981); *Strubbe v. Sonnenschein*, 299 F.2d 185, 192 (2d Cir. 1962); *Bank of Naperville v. Catalano*, 408 N.E.2d 441, 445-46 (Ill. App. 1980). This is a general limitation on restitution unless restitution is sought against a defrauder or other wrongdoer; it is not a limitation that is special to mistake cases. See, e.g., *Amalgamated Ass'n of Street Electric Ry. & Motor Coach Employees of America v. Danielson*, 128 N.W.2d 9, 10-11 (Wis. 1964); *Restatement of Restitution* § 69 (1937). But the owners do not argue that they relied; we'll see shortly why not.

Even without reliance, it can be argued that United is entitled to no relief because a unilateral mistake by a contract party, as distinct from a mutual mistake, is not a generally recognized excuse for failing to comply with the contract's terms. *Praxair, Inc. v. Hinshaw & Culbertson*, 235 F.3d 1028, 1034-35 (7th Cir. 2000); II. E. Allan Farnsworth, *Contracts* § 9.4, p. 614 (3d ed. 2004). But the qualification in "generally" is, as so often in law, critical. Nor is the qualification limited to trivial errors in the administration of a contract, as where one party pays the other the wrong amount because of a mistake in calculation. That by the way is a classic case for restitution even if the mistake was careless—always provided, however, that the payee had not relied on it, to his disadvantage if it is corrected. *Employers Ins. of Wausau v. Titan Int'l, Inc.*, 400 F.3d 486, 490-91 (7th Cir. 2005); *First Wisconsin Trust Co. v. Schroud*, 916 F.2d 394, 401 (7th Cir. 1990); *Leasing Service Corp. v. Hobbs Equipment Co.*, 894 F.2d 1287, 1291-92 (11th Cir. 1990); *St. Paul Federal Savings & Loan Ass'n v. Avant*, 481 N.E.2d 1050, 1057 (Ill. App. 1985).

Closest to the present case is a line of cases illustrated by *M.F. Kemper Construction Co. v. City of Los Angeles*, 235 P.2d 7 (Cal. 1951); see also *Donovan v. RRL Corp.*, 27 P.3d 702, 714-17 (Cal. 2001); *Boise Jr. College District v. Mattefs Construction Co.*, 450 P.2d 604, 608-09 (Idaho 1969); *Kenneth E. Curran, Inc. v. State*, 215 A.2d 702, 703-04 (N.H. 1965); *Maryland Casualty Co. v. Krasnek*, 174 So. 2d 541, 543-44 (Fla. 1965); *City of Syracuse v. Sarkisian Brothers, Inc.*, 451 N.Y.S.2d 945 (App. Div. 1982); II. Farnsworth, *supra*, § 9.4, pp. 614-15. As succinctly explained in *Donovan v. RRL Corp.*, *supra*, 27 P.3d at 715, "the plaintiff in *Kemper* inadvertently omitted a $301,769 item from its bid for the defendant city's public works project—approximately one-third of the total contract price. After discovering the mistake several hours later, the plaintiff immediately notified the city and subsequently withdrew its bid. Nevertheless, the city accepted the erroneous bid, contending that rescission of the offer was unavailable for the plaintiff's unilateral mistake." The court rejected the city's argument. When an innocent mistake can be rectified without harm to anyone (loss of a windfall is not the kind of harm that a court should endeavor to avert), it should be. Especially in a case such as this. If the mistake is not corrected, the cost will be borne not by its maker—United—but by creditors no less innocent than the airplanes' owners. A refusal to correct would serve no deterrent or punitive purpose; it would merely redistribute wealth among creditors capriciously. See *Kontrick v. Ryan*, 540 U.S. 443, 457 n. 12 (2004); *In re New Era, Inc.*, 135 F.3d 1206, 1208 (7th Cir. 1998); *In re Dawson*, 390 F.3d 1139, 1147 (9th Cir. 2004).

The principle of the mistaken-bid cases must not be pressed too far. Otherwise the courts would be drowned in disputes over whether, for example, a seller had made a mistake in charging such a low price—had he studied mar-

ket conditions more carefully he would have realized that the buyer would have been willing to pay more. Cases like *Kemper* and *Boise* distinguish between an obvious error, such as an error in computation, and an "error of judgment," which if a ground of restitution would make every contract party a kind of fiduciary of the opposing party, end arm's length bargaining, and make contractual obligations radically uncertain. The present case, however, is closer to the computation-error pole than to the error-of-judgment pole. Indeed, for all we know, it *was* a computation error that precipitated United's decision not to abandon the three leases.

The bank argues that "excusable neglect," the term in Rule 60(b), does not supply the proper criterion for allowing United to get out from under the bankruptcy court's order approving the retention of the leases because, it argues, United's decision to retain triggered a contractual obligation on United's part to pay any prepetition debt; and so the proper criterion to apply is the criterion for rescission of a contract. But the cases we cited *are* rescission cases.

There is little difference between the criteria for rescinding a contract and the criteria for rescinding a judgment. Compare *S.T.S. Transport Service, Inc. v. Volvo White Truck Corp.*, 766 F.2d 1089, 1093-94 (7th Cir. 1985), and *Monarch Marking System Co. v. Reed's Photo Mart, Inc.*, 485 S.W.2d 905, 906-07 (Tex. 1972), with *Blue Diamond Coal Co. v. Trustees of UMWA Combined Benefit Fund*, 249 F.3d 519, 528-29 (6th Cir. 2001). People rely on contracts and judgments alike, and when they do so reasonably their reliance should not be upset because it was induced by a mistake committed by the other party to the contract or the litigation. If anything, the bank to the contrary notwithstanding, the criteria for rescinding a judgment are stricter, because litigation delay is highly likely to impose costs on innocent third parties. We

may assume that had United taken a year to discover and communicate its mistake, the mistake would not have been "excusable" even if the delay had not harmed the bank.

But that is not this case. Quite the contrary. For remember that the bank discovered United's mistake immediately upon receiving the notice of United's election to continue operating the leases, yet didn't then repossess the planes, as it could have done. Instead the parties agreed that United would pay a portion of what it owed on the leases and the bank would reserve the right to sue for the rest, which it did. This sequence makes clear not only why the error was not rendered inexcusable by delay in discovering it (there was no delay) but also why the bank is not claiming that it relied to its detriment on the mistake (so there was no prejudice either).

The bankruptcy judge was acting within his authority when he decided to relieve United from the consequences of its mistake. The judgment of the district court dismissing the appeal from the bankruptcy court is vacated and the bankruptcy court's order is affirmed.

A true Copy:

Teste:

_____

*Clerk of the United States Court of Appeals for the Seventh Circuit*