In the

# United States Court of Appeals

## For the Seventh Circuit

Nos. 08-1017, 08-1119

BRENDA P. HELMS, Trustee,

*Plaintiff-Appellant, Cross-Appellee.*

*v.*

CERTIFIED PACKAGING CORPORATION,

*Defendant*,

and

CPC ACQUISITION, INC.,

*Intervenor-Appellee, Cross-Appellant.*

Appeals from the United States District Court
for the Northern District of Illinois, Eastern division.
No. 07 C 702—**George W. Lindberg**, *Judge.*

ARGUED NOVEMBER 4, 2008—DECIDED DECEMBER 30, 2008

Before POSNER, WOOD, and TINDER, *Circuit Judges*.

POSNER, *Circuit Judge.* Sarah Michaels, Inc., a manufacturer of bath products and a customer of a packaging

manufacturer named Certified Packaging Corporation, declared bankruptcy together with affiliated corporations unnecessary to discuss separately. The trustee in bankruptcy brought an adversary proceeding against Certified seeking to avoid transfers that Michaels had made to that company to pay for packaging. The trustee obtained a default judgment for some $2 million but in an effort to collect the judgment collided with LaSalle Bank, which, as the assignee of a loan to Certified, claimed a security interest in Certified's assets. LaSalle in turn assigned its claim to CPC Acquisition, which is the successor to Certified and which has intervened in the bankruptcy proceeding to assert the priority of its lien over the trustee's judgment lien. For the sake of simplicity we'll pretend that LaSalle was and remains the lender to Certified and thus the adversary of the trustee in bankruptcy.

In December 2000, after LaSalle had made the loan, a fire broke out at one of Certified's plants and damaged equipment in it. The plant was shut down for several weeks, and the business losses resulting from the shutdown greatly exceeded the damage to Certified's property. Certified brought two lawsuits (both in Illinois state courts) in the wake of the fire. One was against its insurance broker, Rothschild, for negligence in having failed to list the plant on a business-losses insurance policy that Rothschild had procured for Certified. That suit was settled for $88,000 after deduction of attorneys' fees. The trustee contends that the settlement money should belong to the bankrupt estate, LaSalle that the money should belong to it as proceeds of the collateral damaged in the fire. The bankruptcy judge

agreed with the trustee but was reversed by the district judge, and the trustee appeals.

Certified's other suit was against Commonwealth Edison and claimed that the fire had been due to Com Ed's negligence in maintaining one of its power lines. In that suit, which is pending, Certified seeks damages of $2,000,000 for property damage and business losses, the latter accounting for about 90 percent of the claimed damages. The bankruptcy judge, seconded by the district judge, ruled that the business-losses part of Certified's claim against Com Ed belongs to the trustee in bankruptcy, not to LaSalle. The cross-appeal challenges that ruling.

So we must decide whether the negligence claim against Rothschild for business losses, and the parallel claim against Certified, or either, or neither, are part of LaSalle's security interest. The issues are governed by the Uniform Commercial Code, as interpreted by the Illinois courts.

The loan agreement between LaSalle and Certified gave LaSalle a security interest in the equipment damaged in the fire. If a suit against someone who steals or damages collateral eventuates in an award measured by the diminution in the value of the collateral caused by the defendant's wrongdoing, so that the award restores the original value of the collateral, the award, like an insurance payment for damaged collateral, constitutes "proceeds" of the collateral and is therefore covered by the lender's security interest. UCC §§ 9-102(a)(64)(D) (proceeds include, "to the extent of the value of collateral, claims arising out of the loss, nonconformity,

or interference with the use of, defects or infringement of rights in, or damage to, the collateral"), (E); *McGonigle v. Combs*, 968 F.2d 810, 828-29 (9th Cir. 1992); *In re Wiersma*, 324 B.R. 92, 106 (B.A.P. 9th Cir. 2005), reversed on other grounds, 483 F.3d 933 (9th Cir. 2007); *In re Territo*, 32 B.R. 377, 379-80 (Bkrtcy. E.D.N.Y. 1983); Richard F. Duncan et al., *The Law and Practice of Secured Transactions: Working with Article 9* § 2.05[3], pp. 2-57 to 2-58 (2008); R. Davis Rice, "*McCullough v. Goodrich & Pennington Mortgage Fund, Inc.*: Are Secured Creditors Really 'Secure' from Third Party Impairment of Collateral?," 59 *S. Car. L. Rev.* 455, 467-70 (2008); Lynn M. LoPucki & Elizabeth Warren, *Secured Credit: A Systems Approach* 205-06 (2d ed. 1998).

If Certified's suit against Com Ed succeeds, it will be as if Com Ed had converted some $200,000 of the collateral for LaSalle's loan and was therefore obliged to repay it; and "an action for conversion is a proper remedy for a secured party to bring against a third party when its collateral has been disposed of by the debtor." *Taylor Rental Corp. v. J.I. Case Co.*, 749 F.2d 1526, 1529 (11th Cir. 1985); see also UCC § 9-315, comment 2; *Bartlett Milling Co., L.P. v. Walnut Grove Auction & Realty Co.*, 665 S.E.2d 478, 488-89 (N. Car. App. 2008); *Farmers State Bank v. Easton Farmers Elevator*, 457 N.W.2d 763, 766 (Minn. App. 1990). And so the judgment obtained in that suit would constitute proceeds of the collateral up to its value. That is why LaSalle's entitlement to the property-damage component of Certified's claim against Com Ed is unchallenged, and it is why if Rothschild, the insurance broker, had failed to obtain insurance coverage for damage to the physical assets that

secured LaSalle's loan, the claim against the broker rather than for loss of business would be a claim to proceeds of the collateral.

But the claim against Rothschild *was* for failure to obtain business-loss insurance, and we do not see how compensation for that failure can be considered proceeds of collateral. The usual proceeds of collateral are the money obtained from selling it. By a modest extension, as we have just seen, they are money obtained in compensation for a diminution in the value of the collateral. But replacing a business loss is not restoring the value of damaged collateral. There is no necessary relation between the value of collateral and a business loss that results from its being destroyed or damaged—as this case illustrates: the business losses exceeded the impairment of the value of the collateral ninefold. The claim of a secured creditor to the proceeds of collateral cannot exceed the value of the collateral. UCC § 9-102(a)(64)(D), (E); *In re Tower Air, Inc.*, 397 F.3d 191, 199 and n. 10 (3d Cir. 2005); *In re Stevens*, 130 F.3d 1027, 1030 (11th Cir. 1997). Recall the qualification in the definition of proceeds in UCC § 9-102(a)(64)(D): "to the extent of the value of collateral."

The district judge was therefore wrong to treat the $88,000 settlement of Certified's claim against Rothschild for failing to procure business-loss coverage as proceeds of damaged collateral. But LaSalle has another ground for claiming a security interest in Certified's business-loss claim against Rothschild, as well as against Commonwealth Edison. A provision in LaSalle's loan agreement with Certified says that the collateral for the loan includes

"Commercial Tort Claims listed on Schedule B" of the agreement. Certified's claims against both Rothschild and Com Ed are commercial tort claims. UCC § 9-102(a)(13)(A). So if, as LaSalle contends, the loan agreement gave it a security interest in any tort claim filed by Certified, it is entitled to enforce that interest against the settlement that Certified made with Rothschild and against any judgment or settlement that Certified may obtain from Com Ed.

But Schedule B is a blank piece of paper except for its title ("SCHEDULE B: Commercial Tort Claims"). The agreement was amended after the fire yet states that Certified "has no Commercial Tort Claims pending other than those set forth on Schedule B hereto as Schedule B may be amended from time to time. [Certified] shall notify [LaSalle] promptly upon becoming aware of any Commercial Tort Claims of [Certified] which may arise, which notice shall constitute [Certified's] authorization to amend Schedule B to add such Commercial Tort Claim." Schedule B was never amended to add any claims.

No matter, argues LaSalle. Its UCC financing statement claimed collateral in *all* of Certified's assets, expressly including "Commercial Tort Claims," and anyway the purpose of providing notice of liens is to protect subsequent creditors, and there were none. "[T]he purpose of the financing statement is to put third parties on notice that the secured party who filed it may have a perfected security interest in the collateral described, and that further inquiry into the extent of the security interest is prudent." *Magna First National Bank & Trust Co. v. Bank of Illinois*, 553 N.E.2d 64, 66 (Ill. App. 1990); see also *GP Credit*

*Co., LLC v. Orlando Residence, Ltd.*, 349 F.3d 976, 982-83 (7th Cir. 2003). "The financing statement is an abbreviation of the security agreement. It is a streamlined paper to be filed for the purpose of giving notice to third parties of the essential contents of the security agreement." 1 Eldon H. Reiley, *Security Interests in Personal Property* § 7:3, pp. 7-3 to 7-4 (3d ed. 1999).

Because the loan agreement authorized LaSalle to amend Schedule B to add any commercial tort claims that it might acquire, its failure to do so after Certified had notified LaSalle of both commercial tort claims was, LaSalle argues, an innocent mistake that harmed no one, and such mistakes, even when unilateral (that is, made by only one of the parties to the contract), are forgivable; that at least is the standard response of contract law. *Donovan v. RRL Corp.*, 27 P.3d 702 (Cal. 2001); *In re UAL Corp.*, 411 F.3d 818, 823-24 (7th Cir. 2005); *Midwest Commerce Banking Co. v. Elkhart City Centre*, 4 F.3d 521, 525 (7th Cir. 1993); *Market Street Associates Limited Partnership v. Frey*, 941 F.2d 588, 594 (7th Cir. 1991); *Restatement (Second) of Contracts* § 153, illustration 1 (1981); E. Allan Farnsworth, *Contracts* § 9.4, p. 615 (4th ed. 2004). Anyone contemplating lending money to Certified would have seen "Commercial Tort Claims" in the financing statement (filed in the pertinent UCC registry) and, LaSalle argues, would have called LaSalle to ask whether there were any such claims and would have learned about the two lawsuits. And while the fact that no creditor relied on the failure to amend Schedule B to add the tort claims against Rothschild and Com Ed is irrelevant because a trustee in bankruptcy has the rights of a hypothetical secured

creditor, *In re Vic Supply Co.*, 227 F.3d 928, 931 (7th Cir. 2000), LaSalle argues that *any* creditor would have been put on notice by the financing agreement and, thus warned, would quickly have discovered the claims.

Well, that is not true. A prudent potential creditor would have requested a copy of the security agreement because that, and not what an existing creditor's employee might tell the potential creditor over the phone, is the security interest that the parties to the security agreement had agreed to create. The prudent potential creditor would have read the relevant portion of the agreement, seen that Schedule B was blank, and concluded—and would have been reasonable in concluding—that LaSalle had no security interest in Certified's tort claims.

Furthermore, section 9-203(b)(3)(A) of the UCC provides that a security interest is enforceable against a subsequent creditor (or, as in this case, a trustee in bankruptcy accorded the status of a hypothetical secured creditor) only if "the debtor has authenticated a security agreement *that provides a description of the collateral*" (emphasis added). The purpose of the financing statement is to place would-be subsequent creditors on notice that a creditor has a security interest in the debtor's property; it is the security agreement, which in this case is the part of the loan contract that contains the grant to the lender of a security interest, that defines that interest and by defining limits it. UCC § 9-102(a)(73); *Signal Capital Corp. v. Lake Shore National Bank*, 652 N.E.2d 1364, 1371 (Ill. App. 1995); *Allis-Chalmers Corp. v. Staggs*, 453 N.E.2d 145, 148-49 (Ill. App. 1983); *In re Martin Grinding & Machine Works, Inc.*, 793

F.2d 592, 594-95 (7th Cir. 1986) (Illinois law); *Northwest Acceptance Corp. v. Lynnwood Equipment, Inc.*, 841 F.2d 918, 922 (9th Cir. 1988); *In re Macronet Group, Ltd.*, 2004 WL 2958447, at *3-4 (Bkrtcy. N.D. Ill. 2004). Hence less detail is required in the financing statement. UCC § 9-504; Richard F. Duncan et al., *supra*, § 2.02[5][d], pp. 2-22.2 to p. 2-24; cf. 4 James J. White & Robert S. Summers, *Uniform Commercial Code* § 31-3, pp. 107-09 (5th ed. 2004).

In other words, "The security agreement embodies the intention of the parties and is the document which creates the security interest. 'It is the primary source to which a creditor's or potential creditor's inquiry is directed and must be reasonably specific.' *In re Laminated Veneers Co.*, 471 F.2d 1124, 1125 (2d Cir. 1973). The financing statement on the other hand need not particularize in detail the collateral secured under the security agreement because in accordance with the 'notice filing' concept adopted under the Uniform Commercial Code a financing statement serves to give notice that the secured party who filed may have a security interest in the collateral and that further inquiry with respect to the security agreement will be necessary to disclose the complete state of affairs. Thus, while the financing statement may be adequate, it is the security agreement which must resolve the question as to adequacy of the description of the collateral." *In re Fagan*, 1979 WL 30029, p. 2 (S.D.N.Y. June 19, 1979) (citation omitted). So the prudent creditor need look no further than the security agreement. *In re Martin Grinding & Machine Works, Inc.*, *supra*, 793 F.2d at 596-97; *In re Laminated Veneers Co.*, *supra*, 471 F.2d at 1125.

For many kinds of collateral, the description in the security agreement need only name the type of collateral. See UCC § 9-108(b)(3); Reiley, *supra*, §§ 10:14, 10:18, pp. 10-17, 10-20 to 10-21, such as accounts, equipment, and negotiable instruments, UCC §§ 9-102(a)(2), (33), (47). But that is not true of commercial tort claims. *Id*., § 9-108(e). Had the security agreement between LaSalle and Certified been amended to define the collateral as including "all commercial tort claims relating to the fire at Certified's facility," that would have sufficed, § 9-108, for all that the section requires is that the description of a commercial tort claim "contain[] a descriptive component beyond the 'type' alone," *id*., comment 5, such as: "All of debtor's rights to damages or compensation, including insurance proceeds, arising out of destruction of business property located at ____ [and/or which claims are currently pending as Cause No. 123 in the Superior Court of ____ County, State of ____.] or Debtor's claim for [identify tort] against [identify defendant]." Reiley, *supra*, § 10.18, pp. 10-25 to 10-26. But nowhere in the loan agreement is there even an allusion to Certified's two tort claims. The agreement does not mention them and while it purports to grant LaSalle a security interest in after-acquired property, such a grant is ineffective when the property is a commercial tort claim. UCC § 9-204 and comment 4. That is a corollary of the requirement that such claims be described with greater than usual specificity; a claim that has not yet come into being when the security agreement is drafted cannot be described at all.

LaSalle's reliance on *In re Vic Supply Co.*, *supra*, is unavailing, despite the superficial resemblance of that case to

this one. By what was obviously just an oversight the lender had failed to sign the loan agreement, though he continued to extend credit to the borrower in accordance with the agreement's terms. A subsequent lender wanted to knock out the previous lender's security interest on the basis of the defect. We ruled that he could not do that. The agreement adequately described the collateral and was signed by the borrower. It was thus in full compliance with what section 9-203(b)(3)(A) now requires for a security interest to trump a subsequent creditor, *In re Vic Supply Co.*, *supra*, 227 F.3d at 931-32; *Sears v. Conry*, 748 N.E.2d 1248, 1249-50 (Ill. App. 2001); Duncan et al., *supra*, § 2.02[2], p. 2-7, and what section 9-203(1)(a) required when *Vic Supply* was decided, the only relevant difference being that the current provision permits electronic authentication in lieu of the debtor's signature.

LaSalle invokes the "composite document" line of cases, see, e.g., *Gibson County Farm Bureau Co-Operative Ass'n v. Greer*, 643 N.E.2d 313 (Ind. 1994); *In re Bollinger Corp.*, 614 F.2d 924 (3d Cir. 1980); *In re Numeric Corp.*, 485 F.2d 1328 (1st Cir. 1973), which hold that "a writing or writings, regardless of label, which adequately describes the collateral, carries the signature of the debtor, and establishes that in fact a security interest was agreed upon, would satisfy both the formal requirements of the statute [for a valid security agreement] and the policies behind it." *Id*. at 1331; see also 4 White & Summers, *supra*, § 31-3, pp. 103-06. But the issue in this case is not (as in *Vic Supply*) whether there was a valid security agreement, as there obviously was, but whether the agreement adequately described the collateral in contention, which obviously it

did not. A hypothetical lien creditor reading the financing statement, the security agreement, and Schedule B to the security agreement wouldn't have had a clue that LaSalle had a security interest in Certified's tort claims against Rothschild and Com Ed.

The district court's decision is affirmed insofar as the claim against Com Ed that seeks damages in excess of the damaged collateral is concerned, but is reversed with respect to the $88,000 claim against Rothschild. In short, the decision of the bankruptcy court, denying all business-loss relief to LaSalle's successor, CPC Acquisition, is reinstated.